BOSSIER PARISH SCHOOL
BD., Plaintiff,

v.

Janet RENO, Defendant,

and

George Price, et al., Defendant–
Intervenors.

Civ. A. No. 94–1495 (LHS
(USCA), CRR, GK).

United States District Court,
District of Columbia.

Nov. 2, 1995.

James J. Thornton, Jr. and Frank Ferrell of Johnston & Thornton, Shreveport, Louisiana, presented the evidence, for Plaintiff. The pleadings and briefs were written by James J. Thornton, Jr. of Johnston & Thornton, Shreveport, Louisiana.

Nancy J. Sardeson, Steven Mulroy, and Gay Hume, Voting Section, Civil Rights Division, United States Department of Justice, Washington, D.C., presented the evidence, for Defendant. With them on the pleadings and briefs were Elizabeth Johnson, Rebecca Wertz, and John K. Tanner, Voting Section, Civil Rights Division, United States Department of Justice, Washington, D.C.; Deval Patrick, Assistant Attorney General, Washington, D.C.; and Eric H. Holder, Jr., United States Attorney, Washington, D.C.

Patricia A. Brannan of Hogan & Hartson, Washington, D.C., and Samuel Walters of The Lawyers' Committee for Civil Rights Under Law, Washington, D.C., presented the evidence, for Defendant–Intervenors. With them on the pleadings and briefs was John W. Borkowski of Hogan & Hartson, New Orleans, Louisiana.

Before SILBERMAN, Circuit Judge, RICHEY, and KESSLER, District Judges.

## MEMORANDUM OPINION OF THREE–JUDGE COURT UNDER THE VOTING RIGHTS ACT

SILBERMAN, Circuit Judge.

### INTRODUCTION

Plaintiff, Bossier Parish School Board, seeks preclearance under section 5 of the Voting Rights Act, 42 U.S.C. § 1973c, for its proposed redistricting. We shall grant the requested preclearance.

### I.

Bossier Parish is located in northwestern Louisiana, bordered on the north by Arkansas. As reported by the 1990 census, Bossier Parish's population is 86,088, of whom 20.1% are black. Blacks constitute 17.6% of the voting age population of Bossier Parish and 15.5% of its registered voters. Bossier City, the Parish's most populous city, is located in the central western portion of the Parish and has a population of 52,721, of whom 17.95% are black. The black population is also concentrated in Benton, Plain Dealing, Haughton, and in the unincorporated community of Princeton.

Bossier Parish is governed by a Police Jury, the 12 members of which are elected from single-member districts for consecutive four-year terms. At no time in Parish history have the Police Jury electoral districts included a district with a majority of black voters. Since 1983, however, a black police juror, Jerome Darby, has been elected three times from a majority-white district, the last time unopposed.[1]

The Police Jury undertook to redraw its electoral districts because of population shifts, as reflected in the 1980 census, that resulted in widely divergent populations among the existing districts. In November 1990, the Police Jury hired a cartographer, Gary Joiner, to assist in the process. At a public hearing on the Police Jury redistricting, black residents inquired about the possibility of creating majority-black districts, and were told that the black population of Bossier Parish was too far-flung to create any such district. On April 30, 1991, the Police Jury unanimously adopted one of the plans prepared by their cartographer as the final plan. The plan served the police jurors' incumbency concerns, and roughly provided for an even distribution of population among the districts. That same day, Concerned Citizens, a group of black residents of Bossier Parish, submitted a letter to the Police Jury complaining about the manner in which the redistricting plan was prepared and adopted. The plan was forwarded to the Attorney General on May 28, 1991, and, on July 29, 1991, the Attorney General precleared it. On January 11, 1994, the Police Jury unanimously voted to maintain the redistricting plan precleared by the Attorney General.

The Bossier Parish School Board is constituted much like the Police Jury.[2] The School Board has 12 members elected from single-member districts to consecutive four-year terms. Both the Police Jury and School Board electoral districts have majority voting requirements: a candidate must receive a majority of the votes cast, not merely a plurality, to win an election. In the School Board's history, no black candidate has been

1. The district from which Darby was elected in 1983 and 1987 was unique in Bossier Parish. Many of the white residents of the district resided on or near Barksdale Air Force base and tended not to vote in Bossier Parish. This district, when the largely nonvoting military population is removed, was at least 45% black for the 1983 and 1987 Police Jury elections. In the 1991 Police Jury redistricting, however, the Air Force base was removed from Darby's district, after which he ran a successful, unopposed campaign.

2. At all relevant times, the Bossier Parish School Board has been the defendant in a lawsuit seeking the desegregation of the school district's schools. *Lemon v. Bossier Parish Sch. Bd.*, Civ.

Act. No. 10,687 (W.D.La., filed Dec. 2, 1964). The School Board was found liable for intentionally segregating its public schools in violation of the Fourteenth Amendment in *Lemon v. Bossier Parish Sch. Bd.*, 240 F.Supp. 709 (W.D.La.1965), aff'd, 370 F.2d 847 (5th Cir.), cert. denied, 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967). In 1979, the School Board sought a declaration of unitary status and release from continuing court supervision. The Board's motion was denied and the school district has yet to be declared a unitary system. Of the 27 schools in the school district, five have predominately black student populations. [Stip ¶ 242.] The student population of Bossier Parish's schools is roughly 29% black.

elected to membership on the Board, though, as is discussed *infra,* one black School Board member was appointed to a vacant seat in 1992.

The Board, like the Police Jury, was also required to redraw its districts after the 1990 census. In fact, members of the Board had approached the Police Jury about the prospect of jointly redistricting, but were rebuffed by police jurors with incumbency concerns divergent from those of the School Board members.[3] The next scheduled election for the School Board was not until November 1994, and the School Board did not undertake the task of redistricting with particular urgency. In May 1991, the Board hired the same cartographer who had assisted the Police Jury with its redistricting, Gary Joiner. When he was hired, Joiner informed the Board that one readily available option was the Police Jury plan which had already been precleared by the Attorney General and which, if adopted by the Board, was sure to be precleared again. When he was hired, Joiner estimated that the redistricting would require 200 to 250 hours of his time.

At a Board meeting in September 1991, Board member Thomas Myrick suggested that the Board adopt the Police Jury plan. Myrick had participated in a number of meetings with Joiner and police jurors during their redistricting. No action was taken on Myrick's proposal.

On March 25, 1992, George Price, president of the local chapter of the NAACP and a defendant-intervenor in this case, wrote to the Board to express the NAACP's desire to be involved in every aspect of the redistricting process. Price received no response to

his letter and, on August 17, 1992, wrote again, this time to say that the NAACP would dispute any plan that did not provide for majority-black districts. At an August 20, 1992 meeting of the School Board, Price presented a number of proposals concerning the management of the school district to the School Board, including the appointment of a black to fill the vacancy on the Board created by a Board member's departure. Sometime during August 1992, Board members met individually with Joiner to review different options for redistricting.[4]

During the summer of 1992, the NAACP Redistricting Project in Baltimore, Maryland prepared a redistricting plan for the School Board that included two majority-black districts. Price presented the results of these efforts, a partial plan demonstrating the possibility of two majority-black districts, to a School Board official. Price was told that the School Board would not consider a plan that did not set forth all 12 districts. Price brought just such a plan to the September 3, 1992 meeting of the School Board. At that meeting, both Joiner and Bossier Parish District Attorney, James Buller, dismissed the NAACP plan because the plan required splitting a number of voting precincts.[5]

Under Louisiana law, school board districts must contain whole voting precincts (*i.e.,* they may not split voting precincts). *See* Louisiana Revised Statutes, Title 17, § 71.3E.(1) ("The boundaries of any election district for a new apportionment plan from which members of a school board are elected shall contain whole precincts established by the parish governing authority....."). While there has been dispute over the matter, the

---

3. Throughout the 1980s, the Police Jury and School Board maintained different electoral districts.

4. Testimony was presented that, during the redistricting process, members of the School Board made statements possibly indicating that the School Board was undertaking the redistricting with a discriminatory intent. S.P. Davis, attorney for Bossier Citizenship Education, Inc., a plaintiff-intervenor in *Lemon,* and a witness for defendant, testified that Board member Henry Burns told Davis that "while he personally favors having black representation on the board, other school board members oppose the idea." [U.S.Exh. 106, at 17.] George Price testified that

Board member Barry Musgrove told Price that "while he sympathized with the concerns of the black community, there was nothing more he could do for us on this issue because the Board was 'hostile' toward the idea of a black majority district." [D–I Exh. B at ¶ 28.] Price further testified that Board member Thomas Myrick told Price and Thelma Harry, another intervenor and a member of the Benton City Council, that "he had worked too hard to get [his] seat and that he would not stand by and 'let us take his seat away from him.'" [*Id.* at ¶ 29; D–I Exh. E at ¶ 19.]

5. Both the Police Jury plan and the NAACP plan appear in an appendix to this opinion.

parties have stipulated that school boards redistricting around the time the Bossier Parish School Board was redistricting were "free to request precinct changes from the Police Jury necessary to accomplish their redistricting plans." [Stip ¶ 23.] Defendant-intervenors' witness, David Creed, testified that he himself had routinely drawn redistricting plans that split precincts. The largest number of precincts that Creed had ever split was eight—far fewer than the 46 precinct splits resulting under the NAACP plan that was presented to the Board or any other plan proffered since by defendant or defendant-intervenors. In any event, the School Board never approached the Police Jury to request precinct changes.

On September 10, 1992, the School Board interviewed candidates for the one vacant seat on the School Board. By a six-to-five vote, the School Board appointed the only black candidate, Jerome Blunt. Defendant-Intervenors contend that this appointment came despite "bitter opposition from white voters." [D–I Br. at 15.] On September 17, 1992, Blunt was sworn in as a Board member. His term in office lasted six months, ending in a special-election defeat to a white candidate. The vacant seat to which Blunt was appointed represented a district with the population that was 11% black.

At the same meeting during which Blunt took the oath of office, the School Board passed a motion of intent to adopt the Police Jury plan. The School Board announced that a public meeting would be held on September 24, 1992, with final action to be taken on the plan on October 1, 1992.

At the September 24, 1992 meeting, the School Board meeting room was filled to overflowing. Price presented the Board with a petition signed by more than 500 residents of the Parish asking that the Board consider alternative redistricting plans. Additionally, a number of black residents addressed the Board to express their opposition to the proposed Police Jury plan. No one spoke in support of the plan. On October 1, 1992, the School Board unanimously adopted the Police Jury plan. Although he had taken office in time to vote on the plan, Jerome Blunt abstained. One other School Board member,

Barbara W. Gray, was absent and did not vote.

The plan adopted by the School Board pits two pairs of incumbents against each other, leaving two districts with no incumbents. The plan does not distribute the school district's schools evenly among the electoral districts: some have several schools, others have none.

On January 4, 1993, the School Board submitted its proposed redistricting plan to the Attorney General. On March 5, 1993, the Attorney General requested more information on the redistricting plan, which the School Board provided. On August 30, 1993, the Attorney General interposed a formal objection to the School Board's plan. The Attorney General's letter indicated that, while the identical Police Jury plan had been precleared, the Attorney General objected on the basis of "new information." The Attorney General noted that an alternative plan which showed "that black residents are sufficiently numerous and geographically compact so as to constitute a majority in two single-member districts" and which was preferred by members of the black community had been presented to and rejected by the School Board. The Attorney General further cited the School Board's failure to "accommodate the requests of the black community."

The Attorney General's objection letter stated that, while the School Board was not required to "adopt any particular plan, it is not free to adopt a plan that unnecessarily limits the opportunity for minority voters to elect their candidates of choice." The Attorney General rejected the School Board's argument that the Louisiana statute concerning splitting precincts was sufficient reason not to create majority-black districts.

On September 3, 1993, the School Board unanimously voted to seek reconsideration of the objection from the Attorney General. On December 20, 1993, the Attorney General denied the Board's request for reconsideration. The School Board filed this action on July 8, 1994. On April 10 and 11, 1995, this matter was tried before a single judge of this panel, pursuant to an agreement of the parties. The record of those proceedings has

been provided to the other two judges on the panel and closing argument was conducted before the entire panel on July 27, 1995.

In the course of this litigation, defendant-intervenors have prepared two more plans that provide for two majority-black districts. Both plans were prepared by defendant-intervenor's witness, William Cooper. The first plan (Cooper I) provides for one majority-black district in the northwestern corner of the parish and one in Bossier City. The second plan (Cooper II) is not materially different. Neither of these plans was before the School Board when it adopted the Police Jury plan.[6]

## II.

For a political subdivision subject to section 5 to obtain preclearance of a voting change, it must prove that the proposed change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c. All parties agree that the "effect" prong of section 5 requires a showing of retrogression. *See Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1364, 47 L.Ed.2d 629 (1976). And, all parties agree that the School Board's proposed redistricting will not have a retrogressive effect. The case, then, turns on whether plaintiff can by a preponderance of the evidence demonstrate that the redistricting plan was enacted without discriminatory purpose.

The School Board claims to have proved that a variety of nondiscriminatory purposes animated the School Board when they adopted the Police Jury plan. The School Board adopted the Police Jury plan because

it had been precleared by the Attorney General and would provide an easy way to avoid the controversy that increasingly surrounded the redistricting process. Further, the Police Jury plan required that no precincts be split, avoiding the difficulty and expense that would have accompanied any other plan, and particularly the only other plan the School Board had seen: the NAACP plan. The School Board have throughout the litigation proffered a series of other purposes said to have motivated the decision to adopt the Police Jury plan. Among these were a desire to adhere to traditional districting principles and to avoid racial gerrymandering.

Defendant asserts that preclearance should be denied for at least one of several reasons. Defendant argues that we should deny preclearance because the School Board's redistricting plan violates section 2 of the Voting Rights Act. If we conclude that we may not engage in the section 2 inquiry in this section 5 case, defendant contends that we may nonetheless consider the School Board's violation of section 2 as evidence of its discriminatory purpose. Defendant and defendant-intervenors further argue that we should deny preclearance based on "direct" and "indirect" evidence that the School Board acted with a discriminatory purpose.

## III.

### A.

■ Defendant and defendant-intervenors maintain that preclearance must be denied if the School Board's plan runs afoul of section 2 of the Voting Rights Act.[7] We hold, as has every court that has considered the question,

---

6. Because we hold, as is discussed below, that section 2 of the Voting Rights Act, 42 U.S.C. § 1973, has no place in this section 5 action, much of the evidence relevant only to the section 2 inquiry is not discussed in this opinion. We, of course, express no opinion on the merits of any case that may be filed under section 2.

7. Plaintiffs "stipulated" that "[s]ection 5 preclearance of the Bossier Parish School Board's redistricting plan also must be denied if the plan violates Section 2 of the Voting Rights Act, as amended, 42 U.S.C.1973." [Stip ¶ 257.] Why plaintiffs would stipulate to a legal conclusion that no court considering the question has ever

agreed to is beyond us. That plaintiffs did so stipulate does not, however, put the question beyond us. *See Kamen v. Kemper Fin. Servs.,* 500 U.S. 90, 99, 111 S.Ct. 1711, 1718, 114 L.Ed.2d 152 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."). In any event, plaintiff's strenuous argument that *Miller v. Johnson,* —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995), is dispositive of this case is apparently inconsistent with its stipulation.

that a political subdivision that does not violate either the "effect" or the "purpose" prong of section 5 cannot be denied preclearance because of an alleged section 2 violation.

Defendant puts before us many arguments for the inclusion of section 2 in this section 5 action. Defendant contends that the statutory language of section 2 and section 5 are in significant part so indistinguishable as to require the importation of section 2 into section 5. It is also argued that the legislative history of section 2 makes clear that Congress, in amending section 2, intended that voting practices be denied section 5 preclearance where those voting practices violate section 2. Defendant finally contends that this court should defer to defendant's own regulations, which interpret section 5 as requiring denial of preclearance where a proposed change violates section 2.

Defendant has presented many, if not all, of these arguments to other courts and to other panels of this court without any success. Defendant acknowledges these prior cases, but claims that they are distinguishable from the one before us. We, like our predecessors, reject defendant's latest—and by now rather shopworn—effort to squeeze section 2 into section 5.

We are unconvinced by defendant's casual effort to equate the standards of section 2 and section 5. In its brief, defendant asserts that "there is no meaningful distinction between the plain meaning of the term [*sic*] 'effect' and 'result.'" [Def.Br. at 28.] To reach this facile conclusion, one must willfully blind oneself to the fact that the term "results" in subsection (a) of section 2 is defined by reference to the language set forth in subsection (b) of section 2. 42 U.S.C. § 1973.

None of the language that modifies "results" in section 2 appears in section 5.

Not only are the two sections drafted with different language, even a cursory review of the case law applying the two statutory sections as written and as applied over the years makes clear that the two sections serve very different functions.

Section 5 of the Voting Rights Act establishes an extraordinary procedure in our federal system. Before a "covered jurisdiction"—*i.e.*, a State or one of its political subdivisions which is subject to section 5— may change a "voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting," it must have the change precleared by either this court or the Attorney General.[8] *Id.* § 1973c. Preclearance in this court comes in the form of "a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, or in contravention of the guarantees set forth in ... this title." *Id.* § 1973c.

The Supreme Court has read the "effect" prong of section 5 to require that "no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 1364, 47 L.Ed.2d 629 (1976). This "nonretrogression" interpretation has repeatedly been reasserted by the Supreme Court, most recently in *Miller v. Johnson,* —— U.S. ——, ——, 115 S.Ct. 2475, 2493, 132 L.Ed.2d 762 (1995).

---

8. A "covered jurisdiction" is a "State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of [title 42] based upon determinations made under the first sentence of section 1973b(b) of [title 42] are in effect." The prohibitions apply to any State or political subdivision

which (i) the Attorney General determines maintained on November 1, 1964, any test or device, and with respect to which (ii) the Plaintiff's Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per

centum of such persons voted in the presidential election of November 1964.

42 U.S.C. § 1973b(b). A "test or device" is any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.

*Id.* § 1973b(c). The Bossier Parish School Board is indisputably a "covered jurisdiction."

■ This formulation relates directly to section 5's function. Section 5 was enacted in response to the efforts of jurisdictions to avoid compliance with the Voting Rights Act by adopting new, violative schemes as quickly as the old ones could be struck down. *See Beer*, 425 U.S. at 140, 96 S.Ct. at 1363. " 'By freezing election procedures in the covered areas unless the changes can be shown to be nondiscriminatory,' section 5 ensures that a plaintiff seeking to challenge an existing voting scheme in federal court under section 2 will have a stationary target to attack." *New York v. United States*, 874 F.Supp. 394, 400 (D.D.C.1994) (quoting *Beer*, 425 U.S. at 140, 96 S.Ct. at 1363 (internal citations omitted)).

■ Section 2 of the Voting Rights Act uses plainly different language and serves a different function from that of section 5. Under section 2, a "voting qualification or prerequisite to voting or standard, practice, or procedure" in any political subdivision (not just a covered jurisdiction) may be challenged where it "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973(a). Subsection (b) of section 2 provides that a voting procedure has the prohibited result where

> based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

*Id.* § 1973(b). Subsection (b) contains a different standard from the retrogression standard found by the Supreme Court in section 5; as courts have since recognized, section 2 can be violated without any discriminatory purpose and irrespective of whether the disputed voting practice is better or worse than whatever it is meant to replace. *See Thornburg v. Gingles*, 478 U.S. 30, 42–47, 106 S.Ct. 2752, 2761–64, 92 L.Ed.2d 25 (1986). Sections 2 and 5 are substantially different, both on their face and in the manner in which they have been interpreted and applied. *See Holder v. Hall*, —— U.S. ——, ——, 114 S.Ct. 2581, 2587, 129 L.Ed.2d 687 (1994) ("To be sure, if the structure and purpose of section 2 mirrored that of section 5, then the case for interpreting sections 2 and 5 to have the same application in all cases would be convincing. But the two sections differ in structure, purpose, and application." (footnote omitted)).

■ Moreover, the two sections differ as to the allocation of the burden of proof. In an action under section 5, the burden of proof is on the political subdivision seeking to enact a voting change. In a section 2 action, on the other hand, the burden of proof is on the party challenging a voting practice. *See, e.g., Hall v. Holder*, 955 F.2d 1563, 1573–74 (11th Cir.1992), *rev'd on other grounds*, —— U.S. ——, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994); *Solomon v. Liberty County*, 899 F.2d 1012, 1036 (11th Cir.1990) (*en banc*) (Tjoflat, J., specially concurring); *cert. denied*, 498 U.S. 1023, 111 S.Ct. 670, 112 L.Ed.2d 663 (1991); *see also Burton v. Sheheen*, 793 F.Supp. 1329, 1351–52 (D.S.C.1992) (declining to import section 2 into section 5 because, *inter alia*, of the differing burdens of proof), *vacated on other grounds sub nom., Statewide Reapportionment Advisory Comm. v. Theodore*, —— U.S. ——, 113 S.Ct. 2954, 125 L.Ed.2d 656 (1998); *City of Port Arthur v. United States*, 517 F.Supp. 987, 1005 n. 119 (D.D.C.1981) (rejecting claim that section 2 action can collaterally estop section 5 action because, *inter alia*, burdens of proof in each case are different), *aff'd*, 459 U.S. 159, 103 S.Ct. 530, 74 L.Ed.2d 334 (1992). That crucial procedural difference strongly suggests the inappropriateness of importing section 2 standards into section 5.

■ Defendant's reliance on the legislative history of the amendments to section 2 is similarly unavailing. Where the language of a statutory regime is unambiguous, as it is here, we need not resort to that regime's legislative history. *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992). Even if the language of sections 2 and 5 did not plainly contemplate two different and independent inquiries, we would not be per-

suaded that what little legislative history defendant has discovered is sufficient to justify the radical expansion of an already significant encroachment on the prerogatives of States and their subdivisions. Defendant bases its recourse to legislative history in a footnote from the Senate Report that accompanied the 1982 amendments to section 2: "In light of the amendment to Section 2, it is intended that a Section 5 objection also follow if a new voting procedure itself so discriminates as to violate Section 2." S.Rep. No. 97–417, 97th Cong., 2d Sess. at 12 n. 31 (1982) U.S.Code Cong. & Admin.News 1982 pp. 177, 189. Defendant also provides quotes to this effect from two sponsors of the 1982 amendments. The footnote appears in a report that accompanied the 1982 overhaul of section 2 that was precipitated by and intended to repudiate *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). *Georgia v. Reno,* 881 F.Supp. 7, 13 (D.D.C. 1995). In *Mobile,* a plurality of the Supreme Court held that proof of discriminatory purpose was required for a section 2 violation. "The [footnote] cited by the defendants was intended merely to emphasize that proof of the requisite unlawful effect is in itself sufficient under either section, regardless of motive." *Id.* At that time, section 2 was wholly rewritten to provide that no proof of discriminatory purpose is required in actions brought under it; section 5 remained—and remains today—as it had been written in 1975. In the face of the palpably different standards plainly embodied in sections 2 and 5, we think it not plausible that Congress would indicate its desire to raise the hurdle to preclearance by adding the requirements of section 2 to section 5 in a Senate Report footnote. *Accord Arizona v. Reno,* 887 F.Supp. 318 (D.D.C.1995). Had Congress plainly expressed this intention, we would be bound to follow. It did not and we are not.

■ The Department argues in its brief—although it appeared to retreat from this contention at closing argument—that an additional reason for the court to import section 2 into section 5 is that the Department of Justice has promulgated regulations stating that preclearance under section 5 ought to be denied where the proposed voting change violates section 2. *See* 28 C.F.R.

§ 51.55(b)(2) ("In those instances in which the Attorney General concludes that, as proposed, the submitted change is free of discriminatory purpose and retrogressive effect, but also concludes that a bar to implementation of the change is necessary to prevent a clear violation of amended section 2, the Attorney General shall withhold section 5 preclearance."). The Department asserts that "the Attorney General's interpretations of the Act are entitled to great deference." [Def. Br. at 31.] Wherever else the Attorney General's interpretation of section 5 of the Voting Rights Act may be entitled to deference, it certainly is not in this court. We will not defer to the Attorney General where, under the statute, an action seeking preclearance may be brought here in the first instance. *See Litton Fin. Printing Div. v. NLRB,* 501 U.S. 190, 203, 111 S.Ct. 2215, 2223, 115 L.Ed.2d 177 (1991) (citing *Local Union 1395, Int'l Brotherhood of Elec. Workers v. NLRB,* 797 F.2d 1027, 1030–31 (D.C.Cir.1986)); *Kelley v. EPA,* 15 F.3d 1100, 1108 (D.C.Cir.1994) ("Even if an agency enjoys authority to determine such a legal issue administratively, deference is withheld if a private party can bring the issue independently to federal court under a private right of action."), *cert. denied sub nom., American Bankers Ass'n v. Kelley,* — U.S. ——, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995); *cf. Michigan Citizens for an Indep. Press v. Thornburgh,* 868 F.2d 1285, 1293 (D.C.Cir.), *aff'd,* 493 U.S. 38, 110 S.Ct. 398, 107 L.Ed.2d 277 (1989).

As we have noted, all courts to have considered the question have decided that section 2 may not be imported in section 5. *See Texas v. United States,* Civ. Act. No. 94–1529, Mem. Op. at 1–3, 1995 WL 769160 (D.D.C. July 10, 1995); *Arizona v. Reno,* 887 F.Supp. at 320–21; *Georgia v. Reno,* 881 F.Supp. at 13–14; *New York v. United States,* 874 F.Supp. 394 (D.D.C.1994); *see also Burton v. Sheheen,* 793 F.Supp. at 1350–53. Defendant would distinguish these cases, insisting that the other panels refused to import section 2 into section 5 cases because the only alleged section 2 violation was the addition of judgeships to an already existing,

already violative system for the election of judges.[9] *See Texas; Arizona; Georgia; New York.* [Def.Br. at 34.] In this case, defendant contends that the proposed voting change is itself a violation of section 2 and that preclearance must therefore be denied. We are not persuaded. The reasoning used by the prior courts is just as applicable here, regardless of whether a given voting change is styled as an addition to a system that allegedly violates section 2 or a violation of section 2 itself. The statute does not provide for importation of section 2 into section 5, and the particular circumstances of a given section 5 preclearance action can make no difference whatsoever.

In its discussion of the importation of section 2 into section 5, defendant makes no mention of *Miller v. Johnson.* In *Miller,* the Attorney General denied preclearance for the Georgia General Assembly's congressional redistricting plan until it provided for three majority-black districts. —— U.S. at ——, 115 S.Ct. at 2489. In finding that the General Assembly had made race the "predominant factor" in its redistricting and thereby violated the Equal Protection Clause, the Court held that the manner in which the Attorney General had employed section 5 of the Voting Rights Act was "insupportable," and that the Attorney General's incorrect interpretation of section 5 could not be a compelling state interest sufficient to survive strict scrutiny. *Id.* —— U.S. at ——, 115 S.Ct. at 2492. Although much of the discussion in *Miller* concerns the Equal Protection clause, *Miller* is very much a statutory interpretation case. The Supreme Court, rather than decide the constitutional question of whether compliance with the Voting Rights Act could serve as a compelling state interest, expressly repudiated the Department's interpretation of section 5. *Id.* —— U.S. at ——————, 115 S.Ct. at 2490-91. The Court noted that the purpose of section 5 is to avoid retrogression in the position of minority voters, and stated that the "Justice Department's maximization policy seems quite far removed from this purpose." *Id.* —— U.S. at ——, 115 S.Ct. at 2493. "In utilizing § 5 to require States to create majority-minority districts wherever possible, the Department of Justice expanded its authority under the statute beyond what Congress intended and we have upheld." *Id.* The Supreme Court further observed that it had upheld section 5 in *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), as a

> necessary and constitutional response to some states' "extraordinary stratagem[s] of contriving new rules of various kinds for the sole purpose of perpetuating voting discrimination in the face of adverse federal court decrees." ... But [its] belief in *Katzenbach* that the federalism costs exacted by § 5 preclearance could be justified by those extraordinary circumstances does not mean they can be justified in the circumstances of this case.[10]

*Id.* (quoting *Katzenbach,* 383 U.S. at 335, 86 S.Ct. at 822).

Although *Miller* makes no explicit reference to the injection of section 2 into section 5, the import of the opinion on this issue is clear. So long as the standard for the "effect" prong of section 5 remains "nonretro-

---

**9.** Defendant also argues that these cases are wrongly decided and that as "the decisions of co-equal panels of this Court do not constitute binding precedent on this Court." [Def. Br. at 33.] Although we need not be bound by the decisions of co-equal panels, *see In re Korean Air Lines Disaster,* 829 F.2d 1171, 1176 (D.C.Cir.1987), *aff'd sub nom. Chan v. Korean Air Lines, Ltd.,* 490 U.S. 122, 109 S.Ct. 1676, 104 L.Ed.2d 113 (1989), we certainly can be persuaded by them, particularly given the three-judge constitution of these panels and the fact that, in this curious corner of the law, the only entity besides co-equal panels of this court that can ever consider these questions is the Supreme Court.

**10.** The federalism costs of section 5 (even without the importation of section 2) have been noted

throughout its history. *See Georgia v. United States,* 411 U.S. 526, 545, 93 S.Ct. 1702, 1713, 36 L.Ed.2d 472 (1973) (Powell, J., dissenting) ("It is indeed a serious intrusion, incompatible with the basic structure of our system, for federal authorities to compel a State to submit its legislation for advance review."); *South Carolina v. Katzenbach,* 383 U.S. at 359-60, 86 S.Ct. at 834 (Black, J., dissenting in part) ("[section] 5 which gives federal officials power to veto state laws they do not like is in direct conflict with the clear command of our Constitution that 'The United States shall guarantee to every State in this Union a Republican Form of Government'"); *Georgia v. Reno,* 881 F.Supp. at 13 n. 8 (noting that the "extraordinary nature of section 5" argued against importing section 2 into section 5).

gression," the only way for defendant to require the creation of additional majority-black districts before preclearance will be granted is to import the standards of section 2 into the section 5 preclearance process. The very language with which the Attorney General objected to the School Board's redistricting plan makes plain that section 2's standards informed the Attorney General's objection to the School Board's plan.[11] *Miller*, however, makes crystalline what was already clear: section 2 and its standards have no place in a section 5 preclearance action. *See also Texas v. United States*, Civ.Act. No. 94–1529, Mem.Op. at 2–3.

■ In what may by now be a conditioned response, defendant argues that even if we decide that a section 2 action cannot be brought in a section 5 preclearance proceeding, we must still consider evidence of a section 2 violation as evidence of discriminatory purpose under section 5. We again disagree. As we have said, the statutory language sets forth differing standards for the two sections. The line cannot be blurred by allowing a defendant to do indirectly what it cannot do directly. The federalism costs already exacted by section 5 are seriously increased if, under the guise of "purpose" evidence, alleged section 2 violations must be countered by the political subdivision whenever it seeks preclearance. *See New York v. United States*, 874 F.Supp. at 399 ("Were we to accept defendant's theory that discriminatory intent may always be inferred from the existence of an allegedly discriminatory system, nearly every section 5 preclearance proceeding could potentially be transformed into

full-blown section 2 litigation. We think a rule creating such a state of affairs both unwarranted and unwise."). And, *Miller* forecloses the permitting of section 2 evidence in a section 5 case. As a panel of this court recently noted,

> the Court [in *Miller*] reaffirmed that the "purpose" prong of section 5 must be analyzed within the context of section 5's purpose, which "has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise."

*Texas v. United States*, Civ.Act. No. 94–1529, Mem.Op. at 2 (July 10, 1995) (quoting *Miller*, — U.S. at —, 115 S.Ct. at 2493). Given the variety of good reasons not to import section 2 into section 5, we will not permit section 2 evidence to prove discriminatory purpose under section 5.[12]

### B.

The parties agree that the proposed redistricting will not result in retrogression of minority voting strength in Bossier Parish, and thus, that the "effect" prong of Section 5 is not in issue. The statute requires a covered political subdivision seeking a declaratory judgment to prove that the proposed voting change "does not have the purpose *and* will not have the effect of denying or abridging the right to vote." 42 U.S.C. § 1973c (emphasis added).

■ Plaintiff bears the burden of proving that it did not adopt the Police Jury plan with a discriminatory purpose. *Rome v.*

---

11. Compare the Attorney General's August 30, 1993 letter ("[T]he proposed plan, adopted by the parish police jury and recommended by the school board's consultant, *would appear to provide no opportunity for black voters to elect a candidate of their choice* to the school board." (emphasis added)) with section 2 (a violation of section 2 is proved where "it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by [minority citizens] in that [they] have *less opportunity* than other members of the electorate to participate in the political process and *to elect representatives of their choice*" (emphasis added)).

12. At closing argument, defendant's counsel was presented with the question of whether a school

board that affirmatively decides *not* to take race into account in any way could be found to have violated section 5. Counsel stated that a school board with the history and context of the Bossier Parish School Board declined to take race into account would indeed violate section 5. This strikes us as double counting. The reason the Bossier Parish School Board is subject to section 5 at all is, at least in part, because of its history and context. Now that it is subject to section 5, defendant would again cite the School Board's history as a reason to saddle it with the additional burden of affirmatively taking race into account in order to prove that it did not have the proscribed purpose.

*United States,* 446 U.S. 156, 183, 100 S.Ct. 1548, 1565, 64 L.Ed.2d 119 (1980) ("Under [section] 5, the city bears the burden of proving lack of discriminatory purpose and effect."). All courts agree that the entity seeking preclearance has the burden of proving that the proposed change has neither a discriminatory effect nor a discriminatory purpose. How this plays itself out in litigation has been left largely unexplored. But it must be recognized that placing a burden of proving nondiscrimination on the plaintiff is anomalous under our law; the plaintiff is put in the position of proving a negative.[13]

■■■■ Courts have devised complex burden-shifting regimes for litigation under Title VII and section 2 of the Voting Rights Act. In an action under Title VII, a plaintiff complaining of discrimination in the employment context must set forth a *prima facie* case of discrimination. At that point, the burden shifts to the employer to prove that the complained-of employment action was undertaken for other, nondiscriminatory reasons. The burden then shifts back to the plaintiff to prove that the employer's offered reasons are pretextual. *See, e.g., Johnson v. Transportation Agency,* 480 U.S. 616, 628, 107 S.Ct. 1442, 1450, 94 L.Ed.2d 615 (1987); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Similarly, courts in section 2 cases have held that once the plaintiff establishes a *prima facie* case of vote dilution, the burden shifts to the political subdivision to prove that the voting regime does not result in, or have as its purpose, discrimination. *See, e.g., Hall v. Holder,* 955 F.2d 1563, 1573–74 (11th Cir.1992), *rev'd on other grounds,* — U.S. —, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994); *Solomon v. Liberty County,* 899 F.2d 1012, 1036 (11th Cir.1990) (*en banc*) (Tjoflat, J., specially concurring). In actions under both Title VII and section 2, the burden-shifting

regimes were enacted in order to alleviate the difficulty for plaintiffs of proving that defendants acted with discriminatory intent. These procedural services thus do not appear appropriate to a section 5 case.

■■■■ To be sure, something like a burden shifting must occur in this, as in every other, civil case. Once the Board makes out its *prima facie* case, it is entitled to preclearance unless its *prima facie* case is rebutted. *See Director, Office of Workers' Compensation Programs, Dept. of Labor v. Greenwich Collieries,* — U.S. —, —, 114 S.Ct. 2251, 2259, 129 L.Ed.2d 221 (1994) ("[W]hen the party with the burden of persuasion establishes a *prima facie* case supported by 'credible and credited evidence,' it must either be rebutted or accepted as true"). If it is rebutted, then we must weigh the School Board's evidence against that proffered on the other side. If the evidence is equally convincing on either side, the School Board— bearing the risk of nonpersuasion—must lose. *See McCain v. Lybrand,* 465 U.S. 236, 257, 104 S.Ct. 1037, 1050, 79 L.Ed.2d 271 (1984) (in the preclearance process, "the burden of proof (the risk of non-persuasion) is placed upon the covered jurisdiction"). If, however, the School Board's evidence is more persuasive than the evidence proffered against it, the School Board is entitled to preclearance. To make out a *prima facie* case for preclearance, the School Board must demonstrate that the proposed change will have no retrogressive effect, and that the change was undertaken without a discriminatory purpose. Proof of nondiscriminatory purpose must include "legitimate reasons" for settling on the given change. *Richmond v. United States,* 422 U.S. 358, 375, 95 S.Ct. 2296, 2306, 45 L.Ed.2d 245 (1975). When the *prima facie* case has been made by the School Board, defendant must offer evidence in rebuttal in order to prevent preclearance.[14]

---

**13.** It is particularly anomalous where the voting change has no retrogressive effect and the political subdivision thus bears the burden of proving that when it did nothing bad, it did so with a non-bad motive.

**14.** A panel of this court recently stated that, in order to prove that it has not acted with the prohibited intent, the section 5 plaintiff, "[a]s a practical matter," must

come forward with evidence of legitimate, non-discriminatory motives for the proposed changes to the voting laws. In addition, the plaintiff must furnish some affirmative evidence that the proposed changes were not motivated by a discriminatory purpose. Once the section 5 plaintiff has made such a showing, the burden shifts to the Attorney General, as the party resisting preclearance, to provide

The School Board has offered a host of non-discriminatory reasons for adopting the Police Jury plan. We are satisfied that at least two of these are "legitimate, nondiscriminatory motives," *New York,* 874 F.Supp. at 400.[15]

The Police Jury plan offered the twin attractions of guaranteed preclearance and easy implementation (because no precinct lines would need redrawing). The School Board did not like the Police Jury plan when it was first presented to them, and there were certainly reasons not to. The Police Jury plan wreaked havoc with the incumbencies of four of the School Board members and was not-drawn with school locations in mind. When, however, the redistricting process began to cause agitation within the black community, and when it became obvious that any plan adopted by the School Board would give rise to controversy and division (and we find that by the time the NAACP's redistricting plan had been presented to the School Board, the Board could very reasonably foresee this), the Police Jury plan became, as Board member Myrick described it, "expedient." Any port will do in a storm, and when the clouds over the School Board's redistricting process began to grow ominous, the *only* close port was the already precleared Police Jury plan.

Defendant and defendant-intervenors contend that the Police Jury plan itself was precleared by the Attorney General only because relevant information was withheld from the Attorney General. In order for this to be evidence that the School Board adopted the Police Jury plan with an impermissible purpose, the School Board would have to have known that such information had been withheld from the Attorney General, and that but for that withholding, the Attorney General would not have precleared the Police Jury plan. We know of no evidence even suggest-

ing the School Board had any knowledge that the Police Jury plan had been precleared illegitimately if in fact it had been.

Further, the Police Jury plan would require no splitting of precincts. While the evidence on the effect of a school board's efforts to redistrict in a way that splits precincts is confused, what is uncontroverted is that changing precincts is neither guaranteed nor free. The NAACP plan presented to the School Board—the only other plan available to the school board at the time—split at least 46 precincts. Defendant-intervenors' witness, David Creed, who testified that precinct-splitting was quite common and that he himself had drawn several redistricting plans that split precincts, [D–I Exh. F at 2–3], had never drawn a plan that split more than eight precincts. [Tr. II, at 119.] Splitting precincts would have required assistance from the Police Jury—a body that had rebuffed the School Board's earlier overtures for coordinated efforts. And, the splitting of precincts would have cost money. Evidence was presented that each precinct split would cost $850, and even if this number was substantially overstated, no one suggests that precincts can be split for free. When the School Board began the redistricting process, it likely anticipated the necessity of splitting some precincts. It hired the Police Jury's cartographer with the expectation that he would spend a substantial amount of time on the project, and it was given maps of the then-existing precincts and told it would have to work with the Police Jury with respect to the precincts. Nonetheless, the School Board entirely reasonably could have, when faced with the NAACP's plan, arrived quickly at the conclusion that zero precinct splits was significantly more desirable than 46.

Moreover, in the midst of the controversy, at the behest of the black community, and over the "bitter opposition" of some white

---

some evidence of a discriminatory purpose on the part of the legislators who seek to make the change. In the absence of such a showing, the section 5 plaintiff will be found to have carried its burden of establishing a lack of discriminatory purpose.

*New York v. United States,* 874 F.Supp. at 400. That opinion, unfortunately, did not cite any authority for this division of the burden of proof.

**15.** In the course of litigation, the School Board has offered several reasons for its adoption of the Police Jury plan that clearly were not real reasons. At one point, the School Board maintained that it adopted the plan (on October 1, 1992) to avoid running afoul of *Shaw v. Reno,* ——— U.S. ———, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (decided June 28, 1993).

constituents, the School Board itself appointed a black member·to its only vacant seat in time to participate in and vote on the adoption of the Police Jury plan. Defendant tries to minimize this fact by noting that the vote was only six to five, that Jerome Blunt was appointed to a district that was 89% white, and that Blunt promptly lost in a special election six months later. That Blunt was appointed by a bare majority tells us nothing more than that at least a majority of the white Board members were responsive to the black community and were not opposed to black representation on the School Board. That Blunt lost his next election cannot, we think, be fairly laid at the School Board's door, particularly given that the district to which he was appointed—again, at the behest of George Price and others—was the only one with a vacancy. This appointment, particularly when its timing and context are considered, indicates that a majority of the white Board members not only were *not* opposed to black representation on the School Board, but affirmatively brought it about for the first time in Parish history.

■ The School Board thus has presented a *prima facie* case for preclearance. Defendant seeks to rebut this case by presenting what it styles as "direct" and "indirect" evidence of discriminatory purpose.

■ The "direct" evidence presented by defendant and defendant-intervenors consists of the alleged statements of three School Board members. We conclude that none of the statements attributed to these Board members, if they were in fact made, show that the Board acted with a discriminatory motivation. The first statement offered by defendant is perhaps the most troubling. S.P. Davis, an attorney representing a plaintiff-intervenor in the *Lemon* suit, testified that Board member Henry Burns told him that, while Burns himself had no opposition to the idea, other members of the Board were "hostile to black representation on the School Board." [16] Plaintiffs did not cross-examine Davis on this point, so we do not know more specifically what Davis understood Burns to mean by "black representa-

tion." The phrase is subject to at least two interpretations. We would be troubled indeed if Burns was referring to hostility on the part of other Board members to the presence of black persons as members of the School Board. But, because at least six of the School Board members proved their lack of hostility to this sort of black representation by appointing a black Board member, we do not believe that Burns meant this. If Burns meant, by "black representation," that other members of the School Board were opposed to the intentional drawing of majority-black districts in order to ensure black representation on the Board, that is hardly an indication of discriminatory purpose unless section 5 imposes an affirmative obligation to draw additional majority-black districts. There are a host of entirely legitimate reasons to oppose this sort of district-drawing. A Board member could, for example, be opposed to districts that split numerous precincts or that violated traditional districting principles.

■ Board member Barry Musgrove's alleged statement to George Price that, while Musgrove was not personally opposed, other Board members were hostile to drawing majority-black districts is also relied upon by defendant. Musgrove denies making this statement, [Tr. I, at 56.], but we will assume for this analysis that he said what Price says he said. But again, this statement is not evidence of discriminatory purpose. A Board member could have any number of perfectly legitimate reasons to oppose the drawing of majority-black districts, particularly in the manner of the NAACP plan. Without more than Price's testimony, we will not assume the worst and credit the unnamed School Board members with an untoward motivation when the statement lends itself just as easily to a nondiscriminatory interpretation.

■ The last Board-member statement emphasized by defendant is that of Thomas Myrick, as testified to by intervenors George Price and Thelma Harry, that Myrick would not let his seat be taken. But, we do not

---

**16.** We note the difficulty involved in giving weight to testimony as to an out-of-court statement by a third party concerning the mental state of other, unnamed third parties.

attribute a racist motivation to the perfectly understandable expression by an incumbent of the strong desire not to have his district so changed that his constituency is obliterated. Even if Myrick's statement was an indication of a discriminatory purpose on Myrick's part—which we do not think it was—on this record it would be inappropriate to attribute such a purpose to the other nine members of the Board who voted to adopt the Police Jury plan.[17]

■ The "indirect" evidence defendant most heavily relies upon is the "sequence of events leading to the school board's adoption of the police jury plan." [Def. Br. at 15.] Defendant argues that these events raise an inference that the plan was adopted with a discriminatory purpose. Defendant notes that when the Police Jury plan was first presented to the Board, the Board declined to adopt it, in part because it pitted two pairs of incumbents against each other. Defendant also emphasizes the Board's unwillingness to permit participation in the redistricting process by George Price and the NAACP; most of the redistricting work done by the Board was not done publicly. And, defendant argues, and regards as the nail in the School Board's coffin, that the Board "rushed to adopt the police jury plan" only after it "was confronted with the NAACP's plan." [Def. Br. at 18.] If the only evidence before us were that summarized here and relied on so heavily by the defendant, we would still have difficulty following its inferential leap. We think that assuming that the quick rejection of the NAACP plan is probative of a discriminatory purpose requires at least that the Board have regarded the NAACP plan as a plausible plan. We have no evidence that the plan was, as an objective matter, plausible (after all, it split 46 precincts and is no longer seriously put forward by either defendant or defendant-interve-

nors). And, we have no indication that the School Board itself thought the plan plausible. The existence of the NAACP plan demonstrated to the Board that its efforts to redistrict would be subject to exacting review and vociferous criticism. The swift selection of the only plan around that bore the imprimatur of the Attorney General resembles not a brazen stroke in the name of racist redistricting but an understandable, if not necessarily laudable, retreat from a protracted and highly charged public battle. In light of this, and mindful of the Board's demonstrable willingness to *ensure* black representation on the Board (the creation of a majority-black district would not necessarily lead to the election of a black Board member, while the appointment of a black Board member unavoidably would), we think defendant and defendant-intervenors' inference is unjustified.[18]

■ At bottom, defendant's argument that the School Board's adoption of the Police Jury plan rather than something like the NAACP plan runs afoul of section 5 is indistinguishable from an argument rejected by the Court in *Miller v. Johnson.* Here, defendant argues that the School Board has failed to provide an adequate reason explaining why it declined to act on a proposal featuring two majority-black districts. In *Miller,* the "key to the Government's position ... is and always has been that Georgia failed to proffer a nondiscriminatory purpose for its refusal in the first two submissions to take the steps necessary to create a third majority-minority district." —— U.S. at ——, 115 S.Ct. at 2492. The Supreme Court described this position as "insupportable" and stated that Georgia's adherence to "other districting principles instead of creating as many majority-minority districts as possible does not support an inference that the plan 'so discriminates on the basis of race or color

17. When asked at oral argument for the best evidence of discriminatory purpose, counsel for defendant-intervenors pointed to the remarks of the school board members. Our dissenting colleague thinks little of this evidence: "These statements standing alone would certainly be insufficient to show discriminatory purpose." Dissent at 459.

18. Defendant mentions the continuing duty of the School Board to "remedy any remaining vestiges of the dual [school] system" under the order in *Lemon v. Bossier Parish School Board,* 240 F.Supp. 709 (W.D.La.1965), citing in particular the School Board's failure to maintain a biracial committee. We fail to see how this can be in any way related to the School Board's purpose in adopting the Police Jury plan.

as to violate the Constitution,' and thus cannot provide any basis under § 5 for the Justice Department's objection." *Id.* —— U.S. at ——, 115 S.Ct. at 2492 (citations omitted). We note that, in *Miller,* the Department of Justice denied preclearance until the Georgia Assembly had drawn three of 11 (or 27%) black majority districts in a State with a population that is 27% black. The Supreme Court agreed with the district court that the Department of Justice was engaged improperly in "black-maximization" on a theory of section 5 that the Supreme Court rejected. *Id.* *Here,* defendant denied preclearance noting that the Board had adopted the Police Jury plan when it had before it a plan that provided for two of 12 (or 18%) majority-black districts in a parish with a voting-age population that is 17.6% black. The key to defendant's position in this case,

similarly, is that the School Board has not provided an adequate explanation for adopting the precleared Police Jury plan when it had before it the NAACP plan. As *Miller* makes clear, the adoption of one nonretrogressive plan rather than another nonretrogressive plan that contains more majority-black districts cannot by itself give rise to the inference of discriminatory purpose. Defendant here, as it did in *Miller,* pursues a theory the result of which is that no political subdivision presented with a plan that provides for $x$ number of majority-black districts can ever adequately explain its reasons for adopting a plan that provides for $x$ minus $n$ majority-black districts. The *Miller* Court rejected this theory of section 5, and we will not resuscitate it here.

Accordingly, we grant plaintiff Bossier Parish School Board the requested declaratory judgment.

APPENDIX

**Bossier Parish, LA**

**Plan: NAACP**

Districts

1
2
3
4
5
6
7
8
9
10
11
12
Hydro
County

Scale in Miles

0   2   4   8   12

Bossier Parish, LA

Plan: PROPOSEDSCHOOLBD

Districts

| | |
|---|---|
| | 1 |
| | 2 |
| | 3 |
| | 4 |
| | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| | 10 |
| | 11 |
| | 12 |
| | County |

N
W E
S

Scale in Miles

0    2    4         8

KESSLER, District Judge, concurring in part and dissenting in part.

I concur in the holding of section III(A) of the majority opinion, namely, that section 2 of the Voting Rights Act may not be imported into section 5. 42 U.S.C. § 1973c. The statute does not compel such a reading, and all three-judge panels which have addressed the issue have concluded that section 2 requirements are not part of section 5. *See Texas v. United States,* Civ. No. 94–1529, Slip.Op. at 2, 1995 WL 456338 (D.D.C. Apr. 24, 1995); *Arizona v. Reno,* 887 F.Supp. 318, 321–22 (D.D.C.1995); *Georgia v. Reno,* 881 F.Supp. 7, 13–14 (D.D.C.1995); *New York v. United States,* 874 F.Supp. 394, 400 (D.D.C. 1994). Sections 2 and 5 are undoubtedly "designed to complement and reinforce each other," *Arizona,* 887 F.Supp. at 321, but because they "differ in structure, purpose and application," *Holder v. Hall,* —— U.S. ——, ——, 114 S.Ct. 2581, 2587, 129 L.Ed.2d 687 (1994) (opinion of Kennedy, J.), the inquiries into each section are independent. Our colleagues in *Arizona,* recently considered the identical issue, and our holding today with respect to sections 2 and 5 is consistent with that opinion: The School Board may receive clearance under section 5 without demonstrating that its redistricting decision complies with section 2, and the Department may not withhold preclearance merely by establishing a section 2 violation. *See Arizona,* 887 F.Supp. at 323–24.

As to section III(B) of the majority opinion, however, I cannot in good conscience agree with the result reached by my two colleagues. The extensive record demonstrates that the Bossier Parish School Board did not act with "legitimate, nondiscriminatory motives." *New York,* 874 F.Supp. at 400. Rather, in light of the impact the School Board's decision will have on the black community, the long history of discrimination and segregation in the Bossier Parish school system, the perpetuation of the exclusion of blacks from full participation in the electoral

process, the significant timing of events that led up to the School Board's decision, and the noticeable departures from normal procedure, I am convinced that the School Board acted with "the purpose ... [of] abridging the right to vote on account of race or color" in violation of the Voting Rights Act, 42 U.S.C. § 1973c. Accordingly, I would deny preclearance, and I respectfully dissent.

## I.

Under section 5 of the Voting Rights Act, the burden of proving that the adopted plan does not have a discriminatory purpose rests squarely with the Bossier Parish School Board. *Rome v. United States,* 446 U.S. 156, 183 n. 18, 100 S.Ct. 1548, 1565 n. 18, 64 L.Ed.2d 119 (1980); *Georgia v. United States,* 411 U.S. 526, 538, 93 S.Ct. 1702, 1709, 36 L.Ed.2d 472 (1973). As stated succinctly by the majority, if the evidence is equally convincing on either side, the School Board— bearing the risk of nonpersuasion—must lose. Maj. Op. 446; *see McCain v. Lybrand,* 465 U.S. 236, 257, 104 S.Ct. 1037, 1050, 79 L.Ed.2d 271 (1984) (in the preclearance process, "the burden of proof (the risk of nonpersuasion) is placed upon the covered jurisdiction").[1] In this case, the evidence is far from being equally convincing on either side. Not only does the evidence fail to prove absence of discriminatory purpose, it shows that racial purpose fueled the School Board's decision.

## II.

The Supreme Court has told us that "[d]etermining whether invidious purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 564, 50 L.Ed.2d 450 (1977). Such evidence, the Court stated, includes the impact the state's action has on protected mi-

---

1. While it may be true that this burden-shifting scheme is "anomalous under our law," Maj.Op. at 445–446, that should have no influence on our decision. Congress decides how to write the country's statutes, and Congress clearly believed that the states' open defiance of the Equal Pro-

tection Clause—what the Supreme Court called an "insidious and pervasive evil,"—*South Carolina v. Katzenbach,* 383 U.S. 301, 309, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966), was serious enough to warrant the "federalism costs," Maj. Op. at 444 n. 9, of the Voting Rights Act.

nority groups; the historical background of the challenged decision; the specific sequence of events leading up to that decision; any substantive departure from the normal process; and the legislative or administrative history of the decision. *Id.* 429 U.S. at 266–268, 97 S.Ct. at 564–565. *See also Busbee v. Smith,* 549 F.Supp. 494, 516–517 (1982), *aff'd* 459 U.S. 1166, 103 S.Ct. 809, 74 L.Ed.2d 1010 (1983). Applying this legal standard to the record before us, I find that the evidence demonstrates conclusively that the Bossier School Board acted with discriminatory purpose.[2]

### A.

In *Arlington Heights,* the Court said that when analyzing the government's purpose, "an important starting point ... [is the] impact of an official action—whether it 'bears more heavily on one race than another.'" *Arlington Heights,* 429 U.S. at 266, 97 S.Ct. at 563 (quoting *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2049, 48 L.Ed.2d 597 (1976)). The Board's adoption of a redistricting plan with no majority-black districts undoubtedly "bears more heavily" on the black community in Bossier Parish than on the white community, because it effectively prevents black voters from electing candidates of their choice to the School Board.

In Bossier Parish, voting is racially polarized, Stips ¶¶ 181–196. No black person has ever been elected to the Bossier Parish School Board, Stip ¶ 153, despite the fact that 20.1% of the population of Bossier Parish is black, Stip ¶ 5, and almost 30% of its public schools are black. Stips ¶¶ 5, 134. Given this context, black voters may well require a majority-black district in order to have a fair chance of electing candidates of their choice. Further, "[b]ecause it is sensible to expect that at least some blacks would have been elected [to the Board], the fact that none have ever been elected is impor-

tant evidence of purposeful exclusion." *Rogers v. Lodge,* 458 U.S. 613, 623–24, 102 S.Ct. 3272, 3279, 73 L.Ed.2d 1012 (1982). As one federal court of appeals noted, "nothing is as emphatic as zero." *United States v. Hinds County School Board,* 417 F.2d 852, 858 (5th Cir.1969). The fact is, the Board's plan presents the black minority of Bossier Parish with no realistic opportunity to elect any candidates of its choice to any of the board seats.

Moreover, as Defendant–Intervenors demonstrated, it was clearly possible to draw a redistricting plan for the Bossier Parish Schools with one or two majority-black districts, and still respect traditional districting principles.[3] The School Board admits that it is "obvious that a reasonably compact black-majority district could be drawn in Bossier City." Stip ¶ 36. But rather than consider either of the alternative proposals brought before it or direct their own cartographer to draft one, the School Board adopted a plan "which guaranteed that blacks would remain underrepresented on the [School Board] by comparison to their numerical strength in the enlarged community." *City of Port Arthur v. United States,* 517 F.Supp. 987, 1022 (D.D.C.1981), *aff'd,* 459 U.S. 159, 103 S.Ct. 530, 74 L.Ed.2d 334 (1982). This conscious decision to adopt a plan that effectively excludes minority voters from the political process is probative of discriminatory intent.

### B.

The Supreme Court has held specifically that "the historical background of the challenged decision" is properly part of the purpose inquiry under the Voting Rights Act. *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. at 564. Here, the history of discrimination and racism in and out of the school system demonstrates that the School Board's vote was yet another chapter in its long-standing refusal to address the concerns of the black

---

**2.** It is telling that the majority never once refers to *Arlington Heights* when they evaluate the evidence submitted by the Department and Intervenors. *See* Maj.Op. at 447–449. Indeed, the majority articulates no standard by which it decides whether "the School Board's evidence is more persuasive than the evidence proffered against it." Maj.Op. at 446.

**3.** In addition to the plan presented to the School Board on September 3, 1992, Defendant–Intervenors have presented two other plans that show it is possible to draw majority-black districts in Bossier Parish which are fully consistent with traditional districting principles.

community of Bossier Parish. Evidence of historical discrimination "is relevant to drawing an inference of purposeful discrimination, particularly in cases such as this one where the evidence shows that discriminatory practices were commonly utilized ... and that they were replaced by laws and practices which, though neutral on their face, serve to maintain the status quo." *Rogers,* 458 U.S. at 625, 102 S.Ct. at 3279.[4]

It is undisputed that Louisiana and the Bossier school system have a history of segregation and racial discrimination predating the Civil War. Following the passage of the Thirteenth Amendment, Louisiana began what the Supreme Court has called "unremitting and ingenious" defiance of the Constitution, *South Carolina v. Katzenbach,* 383 U.S. 301, 309, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966), by passing laws designed to disenfranchise black voters. Stip ¶ 216. One law prohibited elected officials from helping illiterates. Another statute required all voters to use complex application forms, prohibited explanation of application questions, and facilitated wholesale purges by party officials of voters who managed to register successfully. *Id.* The new laws reduced black registration by 90 percent in the state, leaving only 10 percent of adult black males eligible to vote. Stip ¶ 216. Two years later, in 1889, Louisiana's Constitutional Convention imposed a "grandfather" clause and educational and property qualifications for voter registration. Both provisions were designed to limit black political participation, Stip ¶ 217, and both succeeded: black males constituted just 4 percent of the state's population. *See United States v. State of Louisiana,* 225 F.Supp. 353, 373 (E.D.La.1963).

In 1921, pursuant to state law, the state Democratic party established an all-white primary. Stip ¶¶ 220, 222. That same year, the Legislature replaced the grandfather clause with a requirement that an applicant "give a reasonable interpretation" of any section of the federal or state constitution in order to vote. Stip ¶ 221. After the all-white primary was struck down by a federal court, the Democratic party adopted an anti-single-shot law, and a majority vote requirement for party officers. *Major v. Treen,* 574 F.Supp. 325, 341 (E.D.La.1983). The "reasonable interpretation" requirement was finally held unconstitutional by the United States Supreme Court in 1965. *Louisiana v. United States,* 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965).

In the Bossier school system it was much of the same. Despite the Supreme Court's decision in *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), *de jure* segregation was the rule in Louisiana public schools, and federal courts were forced to order school districts to comply with federal law. Stip ¶ 235. Since 1965, the Bossier Parish School Board has been the defendant in *Lemon v. Bossier Parish School Board,* Civ.Act. No. 10,687 (W.D.La., filed Dec. 2, 1964) in which it was found liable for intentionally segregating the public schools in violation of the Fourteenth Amendment. *Lemon v. Bossier Parish Sch. Bd.,* 240 F.Supp. 709 (W.D.La.1965), *aff'd,* 370 F.2d 847 (5th Cir.1967), *cert. denied* 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967).

Throughout the late 1960's and early 1970's, the school board sought to limit or evade its desegregation obligations. At one

---

4. The majority excludes evidence of historical discrimination in the Bossier Public Schools and Bossier Parish because it believes that such "evidence [is] relevant only to the section 2 inquiry." Maj.Op. at 440, n. 5. In my view, the majority wrongly believes that once we decide that sections 2 and 5 are analytically distinct, we may not use evidence of historical discrimination (which is central to a section 2 inquiry) to decide the "purpose" prong of section 5. But as the panel recently explained in *Arizona v. Reno,* 887 F.Supp. at 323, nothing in the statute or case law leads to that conclusion. "Although the inquiry required under the purpose prong of section 5 extends into areas that would also be relevant in a section 2 proceeding," that does not mean that considering evidence of historical discrimination is "tantamount to launching a section 2 proceeding ... under the guise of section 5." *Id.* at 323.

More importantly, excluding evidence of historical discrimination contravenes the Supreme Court's explicit direction in *Arlington Heights,* where the Court stated that among the factors to consider in the "purpose" inquiry is the "historical background of the decision ... particularly if it reveals a series of official actions taken for invidious purposes." 429 U.S. at 268, 97 S.Ct. at 564. In short, the majority ignores the standard the Supreme Court established to govern precisely the type of inquiry we must make in this case.

point, the School Board sought to assign black children of Barksdale Air Force Base personnel to black schools without a right to transfer to white schools, claiming that they were "federal children" and not within the "jurisdiction" of the school district. Stip ¶ 237. Circuit Judge Wisdom rejected the School Board's "new and bizarre excuse" for rationalizing its denial of the constitutional right of black school children to equal educational opportunities. *Bossier Parish School Board v. Lemon,* 370 F.2d 847, 849 (5th Cir.1967).

In 1969, the Fifth Circuit rejected the school board's "freedom of choice" plan in *Hall v. St. Helena Parish Sch. Bd.,* 417 F.2d 801 (5th Cir.1969), and in 1970, after "protracted litigation," rejected another inadequate remedial plan proposed by the district in *Lemon v. Bossier Parish Sch. Bd.,* 421 F.2d 121 (5th Cir.1969).

In 1971, the court held unconstitutional the School Board's plan to assign students to one of two schools in Plain Dealing based on their test scores. *Lemon v. Bossier Parish Sch. Bd.,* 444 F.2d 1400 (5th Cir.1971). In 1979, the School Board filed a motion seeking a declaration of unitary status and a release from further court supervision. The motion was denied, and the school district has yet to be declared a unitary system. Stip ¶ 239. Since 1980, despite the School Board's continuing duty to desegregate, the number of elementary schools with predominately black enrollments has increased from one to four. To this day, the School Board remains under direct federal court order to remedy any remaining vestiges of segregation in its schools.

The Board has also failed to honor the *Lemon* court's order to maintain a Biracial Committee to "recommend to the School Board ways to attain and maintain a unitary system and to improve education in the parish." Stip ¶ 111. The committee met only 2 or 3 times, and only the black members attended. For decades following the court's order, the Board ignored this requirement altogether. Stip ¶ 112. In 1993, the Board finally established a similar committee, but disbanded it after three months because, according to School Board Member Barry Musgrove, "the tone of the committee made up of the minority members of the committee quickly turned toward becoming involved in policy." Stip ¶ 116. What exactly the Committee was supposed to become involved in, if not policy, is unclear. What is clear is that the Board's unilateral dismantling of the Committee was in direct violation of a federal court order to address the concerns of the black community.

The School Board's adoption of the Police Jury plan must be evaluated in the framework of this long history of official discrimination. It may seem unduly harsh to consider racism and discrimination dating back to the Civil War, but this history reveals an insidious pattern which cannot be ignored, and must inform our decision today. Like the school boards and legislatures before it, the Bossier Parish School Board's actions effectively eliminate the black community from the political process. So long as black voters have no electoral power, they have no voice, and the School Board can safely ignore their concerns.

### C.

The Supreme Court has told us that "the specific sequence of events leading up to the challenged decision may shed some light on the decisionmaker's purpose." *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. at 564. Here, the sequence of events leading up to the adoption of the Police Jury plan supplies further proof of discriminatory purpose.

The redistricting process began in May, 1991, when the Board decided to develop its own plan rather than adopt the one accepted by the Police Jury. Given the fact that the next School Board election was not scheduled until October, 1994, there was no need for hasty Board action. The Board hired Gary Joiner, a cartographer, who had drawn the Police Jury plan. He was hired to perform 200–250 hours of work, far more time than would be needed simply to recreate the Police Jury plan. Stip ¶ 86. On July 29, 1991, the Police Jury plan was precleared by the Justice Department. On September 5, 1991, however, the School Board decided *not* to adopt the Police Jury plan, largely because it would pit incumbents against each other. Over the course of the next year, School

Board members considered a number of re-districting options. Mr. Joiner met privately with School Board members and demonstrated different possibilities to them on his computer. Stip ¶ 96. These meetings were not open to the public nor were there any recorded minutes or published notice of the meetings.

While the School Board was meeting and planning in private, the black community was trying, unsuccessfully, to participate in public. In March of 1992, George Price, on behalf of a coalition of black community groups, wrote the School Board asking to participate in its redistricting process. Stip ¶ 93. Neither the Board nor the Superintendent responded to this request. *Id.* In August of 1992, Mr. Price sent another letter asking specifically to be involved in every aspect of the redistricting process. Again, no response. Stip ¶ 94.

Frustrated by the School Board's unresponsiveness, Price contacted the NAACP Redistricting Project in Baltimore. The Project developed a partial plan for Price to present to the School Board that consisted of two majority-black districts. Stip ¶ 98. The plan did not show the other ten districts that made up the Parish. When Price showed this plan to a school district official, he was told that the plan was unacceptable because it only showed two districts. Price went back to the NAACP and a new plan was drawn up.

Then, on September 3, 1992, when Price appeared on behalf of the black community at a public hearing and presented a new plan showing all twelve districts, including two majority-black districts, the Board dismissed it summarily, claiming—incorrectly—that they could not consider any plan that split precinct lines.[5] Stip ¶ 102.

At its next meeting, on September 17, 1992, without any further consultation with its cartographer or attempt to address the concerns of the black community, the School Board passed a motion of intent to adopt the Police Jury plan, which had no majority-black districts. At that meeting, Mr. Price

again presented the NAACP proposal. Stip ¶ 106. Instead of discussing the plan with Mr. Joiner, or asking him to further analyze the possibility of drawing black-majority districts without splitting precincts (the School Board's purported reason for rejecting the plan), the Board simply passed the motion of intent to adopt the Policy Jury plan at the next School Board meeting. *Id.*

One week later, on September 24, 1992, an overflow crowd attended a public hearing on the redistricting plan. Fifteen people spoke against the School Board's proposed plan, most of whom objected because it would dilute minority voting strength. Not a single person spoke in favor of the plan. Stip ¶ 108. At this hearing, Mr. Price presented the Board with a petition signed by more than 500 Bossier Parish citizens, asking the Board to consider an alternative redistricting plan. *Id.*

Despite the one-sided input from Bossier citizens, and despite the fact that the Board was under *no* time pressure to decide the issue, the Board voted one week later to adopt the Police Jury plan. As with the meetings of September 3 and September 17, the Board's minutes of the October 1, 1995 meeting reflect little substantive consideration of the Police Jury plan, other than to approve the Police Jury plan as quickly as possible.[6] Board Member Myrick testified that the Board adopted the plan that evening because it was "expedient."

The Police Jury plan only became "expedient" when the School Board was publicly confronted with alternative plans demonstrating that majority-black districts could be drawn, and demonstrating that political pressure from the black community was mounting to achieve such a result. The common-sense understanding of these events leads to one conclusion: The Board adopted the Police Jury plan—two years before the next election—in direct response to the presentation of a plan that created majority-black districts. Faced with growing frustration of the black community at being excluded from

---

5. See discussion at pages 443–444, *infra.*

6. For example, the Board seems to have abandoned its concerns about the Police Jury plan pitting incumbents against each other.

the electoral process, the only way for the School Board to ensure that no majority-black districts would be created was to quickly adopt the Police Jury plan and put the issue to rest. This sequence of events of "public silence and private decisions," [7] culminating in the Board's hasty decision, is evidence of the Board's discriminatory purpose.

### D.

The fact that the Board adopted a plan which departs substantively from its earlier districting plans and which ignores factors it has usually considered of paramount concern, is probative of discriminatory purpose, "particularly if the factors usually considered important by the decision-maker strongly favor a decision contrary to the one reached." *Arlington Heights,* 429 U.S. at 267, 97 S.Ct. at 564. The most glaring example is that the adopted plan forced incumbents to run against each other. Incumbency protection has always, understandably, been a high priority for both the Police Jury and School Board. That was the reason there were different redistricting plans in effect for each entity during the 1980s. That was also the reason the Police Jury refused to conduct a joint redistricting effort with the school board after 1990.

Moreover, the plan adopted by the Board contravenes other traditional districting principles. For example, it creates one district containing almost half of the geographic area in the Parish. Stip ¶ 140. Several of its districts are not compact, according to the Board's own consultant. Stip ¶ 139. In addition, the plan creates election districts without any schools in them and ignores school attendance boundaries. Stip ¶ 141. Finally, the plan does not respect communities of interest in Bossier Parish. Stip ¶¶ 135–137.

Perhaps if the Board had ignored one or two of these standard redistricting criteria, it would not be noteworthy, but when the Board's plan plainly violates a whole number of redistricting principles, we have further evidence from which to infer that the Board's

decision was fueled by discriminatory purpose.

### E.

In setting forth the evidentiary categories to be evaluated in determining whether invidious purpose was a motivating factor, the Supreme Court in *Arlington Heights* noted that its listing of such categories was not exhaustive. 429 U.S. at 268, 97 S.Ct. at 565. Thereafter, in *Rogers v. Lodge,* 458 U.S. 613, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), the Court considered additional political and sociological factors that underscored the state's discriminatory purpose. In *Rogers,* the Court struck down Burke County, Georgia's at-large election system, holding that it violated the Fourteenth and Fifteenth Amendments because the state had acted with discriminatory purpose. The Court considered important the fact that "lingering effects of past discrimination," caused socioeconomic disparity between whites and blacks. *Id.* 458 U.S. at 626, 102 S.Ct. at 3280 (citations omitted). The Court also said that it was important to consider the educational disparity between whites and blacks. *Id.* 458 U.S. at 624, 102 S.Ct. at 3279. Here, it is undisputed that black citizens in Bossier Parish suffer a markedly lower socioeconomic status than their white counterparts, and that the difference is traceable to the legacy of racial discrimination in the Parish. Stip ¶ 200.

According to the 1990 Census [8], the poverty rate for blacks (44.7%) is nearly five times the rate for whites (9.1%). The per capita income of blacks ($5,260) is only 40% of that enjoyed by whites ($12,966). The unemployment rate for blacks age 16 and over (22.4%) is nearly four times that for whites. The percentage of blacks over 25 without a high school degree (40.6%) is over twice the rate of whites (16.7%). Only 4.8% of whites age 25 and older have less than a ninth grade education, while 22.8% of blacks in the same age category have less than a ninth grade education. Almost 84% of whites 25 years or older were at least high school graduates, compared to only 58.7% of blacks. Also, 17%

---

7. Def.–Int. Bf. at 20.

8. Stip ¶¶ 204, 208, 211.

of whites 25 years or older had at least four years of college, compared to only 8.1% of blacks. In 1990, only 2.9% of the white labor force were unemployed, while 9.1% of the black labor force was unemployed. Finally, whites are five times as likely to own a car as blacks, a significant fact in a rural parish where voting places may be distant from people's homes.

It is also undisputed that the depressed socioeconomic and educational levels of blacks within Bossier Parish make it hard for them to obtain necessary electoral information, organize, raise funds, campaign, register, and turn out to vote, and this in turn causes a depressed level of political participation for blacks within Bossier Parish. Stip. ¶ 213. Like the state representative in Burke County in *Rogers,* the School Board members in Bossier Parish "have retained a system which has minimized the ability of [Bossier Parish] Blacks to participate in the political system." 458 U.S. at 626, 102 S.Ct. at 3280 (citations omitted).

Thus, the additional factors identified by the Supreme Court in *Rogers,* are met foursquare in this case. As the Court explained in *Rogers,* "[n]ecessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another." 458 U.S. at 618, 102 S.Ct. at 3276 (quoting *Washington v. Davis,* 426 U.S. at 242, 96 S.Ct. at 2049).

### F.

We also have before us statements made by three School Board members about minority representation on the Board. School Board member Henry Burns said that while he "personally favors having black representation on the board, other school board members oppose the idea." U.S.Exh. 106 ¶ 17. School Board member Barry Musgrove said that "while he sympathized with the concerns of the black community, there was nothing more he could do ... on this issue because the Board was 'hostile' toward the idea of a black majority district." *Id.* And School Board member Thomas Myrick told George Price of the NAACP that "he had worked too hard to get [his] seat and that he would not stand by and 'let us take his seat away from him.'" U.S.Exh. 106 ¶ 29, D–I Exh. E ¶ 19.

These statements standing alone would certainly be insufficient to show discriminatory purpose. However, considered in the context of the School Board's discriminatory past, the efforts to preserve segregation and exclude black representation from the Board, the sequence of events leading up to the Board's decision, and the anomalous nature of the plan itself, the statements add further proof of improper motive. While the majority is correct that the statements are subject to different interpretations, Maj. Op. at 447–448, given all the evidence previously set forth showing discriminatory purpose, and the efforts of the past fifty years to desegregate the schools, it seems fair to conclude that at least *some* School Board Members were openly "hostile" to black representation on the school board.[9]

\*    \*    \*

For all the foregoing reasons, the only conclusion that can be drawn from the evidence is that the Bossier School Board acted

---

9. The majority argues that the appointment of Jerome Blunt to fill a vacant seat on the Board "proved [the Members'] lack of hostility to this sort of black· representation." Maj.Op. at 447. However, Mr. Blunt was appointed to represent a district that was only 11% black, and his short tenure on the job was a stark reminder of the highly polarized voting in Bossier Parish, *see* section II(A), *supra.* Mr. Blunt's chances of re-election were slight, and his short-lived appointment was a far-cry from the full tenure of an elected black school committee member.

The majority notes, however, that the "timing and context" of Blunt's appointment indicate that the Board acted for legitimate reasons.

Maj. Op. at 447–. The facts suggest the opposite. Blunt was appointed on September 17, 1992— squarely in the middle of the controversy surrounding the redistricting plan—at the very meeting where the Board adopted a motion of intent to adopt the Police Jury plan and after George Price had made his demands for a majority-black district. Certainly, Board members knew that adopting the Police Jury plan would ignite controversy in the black community. And on the very night of that decision, the School Board appointed a black to fill a seat that they knew he would be unable to hold, hoping to quell the political furor over adoption of the Police Jury plan.

with discriminatory purpose. The adopted plan has a substantial negative impact on the black citizens of Bossier Parish. The sequence of events leading up to the decision show conclusively how the School Board excluded the black community from the redistricting process and rushed to adopt the Police Jury plan only when faced with an alternative plan that provided for black representation. The plan itself ignores and overrides a number of the School Board's normally paramount interests. And the statements of some School Board members certainly lend strength to the other evidence. "Justice is blind; but courts nevertheless do see what there is clearly to be seen." [10] We cannot blind ourselves to the reality of the situation and the record before us. The Bossier School Board acted with discriminatory purpose in adopting the Police Jury Plan.[11]

### III.

In the face of this considerable evidence, the School Board has offered several reasons for its adoption of the Police Jury plan. Even the majority admits that a number of these reasons "clearly were not the real reasons," Maj.Op. at 446 n. 14, i.e., the School Board lied.

For example, at one point, the School Board argued that it adopted the Police Jury plan (on October 1, 1992) to comply with *Shaw v. Reno*, —— U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993) (decided June 28, 1993), which was decided nine months *after* the Board adopted its plan. Although the Board does not lie as fragrantly in its remaining rationales, they are equally unconvincing.

The School Board claims that it could not adopt any p.an with majority-black districts because such a plan would require precinct-splitting, which violates state law and would be prohibitively expensive. The evidence

shows conclusively, however, that throughout the redistricting process, the School Board was willing to split precincts to do just that, i.e., to split precincts so long as it was for the protection of incumbents. It was only *after* the black community presented its alternative plan that the School Board proffered the "no precinct-splitting" rationale.

The majority agrees that when "the School Board began the redistricting process, it likely anticipated the necessity of splitting some precincts." Maj.Op. at 447. The School Board hired Mr. Joiner at the beginning of the process to develop the plan, fully intending that he would split precincts (that is why he needed between 200–250 hours to complete the job). At the September 5, 1991 School Board meeting, the first School Board meeting after the Police Jury plan had been precleared by the Department, Mr. Joiner presented proposed maps that showed split precincts. Further, it is now undisputed by the School Board that splitting precincts does not violate state law. While the School Board itself may not split precincts, police juries have the authority to establish and modify precinct lines, Stip ¶¶ 13–23, and many do so when requested by a school board. The Bossier Parish Police Jury itself created 13 new precincts in 1991, Stip ¶ 60, and the School Board has stipulated that the Police Jury was currently considering consolidating some of its precincts for other reasons. Stip ¶ 61.

Once again, it was only after being presented with the black community's plan, and the possibility of a majority-black district in the ensuing election, that the Board totally reversed itself and "arrived quickly," Maj.Op. at 447, at the conclusion that it was *against* splitting districts. Nor did the School Board voice its concern about *too many* precinct splits causing higher election costs in its initial submission to the Department.

---

**10.** *Laker Airways Limited v. Pan American World Airways*, 568 F.Supp. 811, 816 (D.D.C.1983). While Judge Harold Greene made this observation in a very different context (an anti-trust case), its pithiness and wisdom apply beyond that context.

**11.** Because of the paucity of public discussion about the Board's decision (except for those who

opposed it), and because the Board left virtually no legislative history, we cannot assess the "minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 268, 97 S.Ct. at 565. Given the considerable evidence showing discriminatory purpose, however, the Board's failure to document its decisionmaking process is certainly suspect.

U.S.Exh. 102 at 9 (testimony of Blunt). Moreover, the Board never estimated the cost of splitting precincts before it voted to adopt the Police Jury plan. *Id.* Obviously, "cost" did not actually motivate the School Board's decision at the time it was made. The focus of our inquiry is what motivated the Board *at the time of its decision,* not whether post-decision rationales would have been legitimate reasons. The Board's excuses on the significant subject of precinct-splitting are clearly not justified.

The final reason offered by the School Board is that the Police Jury plan guaranteed preclearance, that is, the Department would approve the School Board's plan because it was identical to the Police Jury plan which was precleared on July 29, 1991. It is clear, however, that "guaranteed preclearance" was not the School Board's motive as it began the redistricting process, because if so, it would not have waited until October 1, 1992—almost 14 months later—to adopt the Police Jury plan. If guaranteed preclearance was what the Board wanted, it would have acted soon after the Police Jury plan was precleared by the Justice Department on July 29, 1991. As with the precinct-splitting issue, this rationale also surfaced only after the School Board was faced with alternative plans that could conceivably lead to majority-black districts and an elected black member.[12] The evidence shows that School Board members adopted the Police Jury plan not because it "guaranteed preclearance," but because given growing dissatisfaction in the black community, it was the only way to ensure that there would be no black majority districts.

The Board's rationales simply do not withstand a common-sense reading of the record. Some of the rationales are untrue on their face, and others do not bear even minimum scrutiny. Most of the alleged justifications are absent from the public record, so the School Board asks us to accept their post-hoc rationalizations rather than focus on their motive at the time of the decision. "[I]nvidious purpose may often be inferred from the totality of the relevant facts." *Washington v. Davis,* 426 U.S. 229, 242, 96 S.Ct. 2040, 2048.

The evidence is clear that racial purpose was "*a* motivating factor in the [Board's] decision" to adopt the Police Jury plan. *Arlington Heights,* 429 U.S. at 265–266, 97 S.Ct. at 563 (emphasis added). The burden of proof is on the School Board to show absence of discriminatory purpose, *Rome v. United States,* 446 U.S. 156, 183 n. 18, 100 S.Ct. 1548, 1565 n. 18, 64 L.Ed.2d 119 (1980), and it has woefully failed to satisfy that burden. Its rationales are so flagrantly pretextual as to further corroborate the conclusion that the School Board acted with discriminatory purpose.

### IV.

The School Board claims that the Supreme Court's recent decision in *Miller v. Johnson,* —— U.S. ——, 115 S.Ct. 2475, 132 L.Ed.2d 762 (1995), precludes it from adopting any majority-black districts because such districts would constitute "racial gerrymandering" in violation of the Equal Protection Clause. The School Board's reading of *Miller* is erroneous for a number of reasons.

First, this is simply not a *Miller* case. We do not have *any* plan with majority-black districts to evaluate, no less a plan where, as in *Miller,* "race was the overriding and predominant force in the districting determination." *Id.* —— U.S. at ——, 115 S.Ct. at 2485. Since the School Board chose to adopt the Police Jury plan, it would be sheer speculation on the basis of this record to determine whether "race was the predominant factor motivating," *id.* —— U.S. at ——, 115 S.Ct. at 2485, some other hypothetical redistricting plan. Defendant and Defendant–Intervenors are not even arguing that any particular plan

---

12. It is hard to accept the majority's unduly charitable characterization of this decision as nothing more than "an understandable, if not necessarily laudable, retreat from a highly charged public debate," Maj. Op. at 449, when the evidence shows overwhelmingly that the black community was excluded from that public debate. School Board members did more than simply retreat from a political debate; in the guise of "expediency," Dep. of Myrick, they excluded black citizens from the only process that would allow that community to elect a candidate of its choice.

should have been adopted by the School Board. How, in the absence of any concrete plan, can a court decide whether a plaintiff has proven that the government "subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, [and] respect for political subdivisions or communities"? *Id.* — U.S. at ——, 115 S.Ct. at 2488. The court would be speculating, and the prohibition against advisory opinions prohibits us from answering such hypothetical legal questions. *See Flast v. Cohen*, 392 U.S. 83, 96–97, 88 S.Ct. 1942, 1950–51, 20 L.Ed.2d 947 (1968) (such suits lack the "clash of adversary argument exploring every aspect of a multifaceted situation embracing conflicting and demanding interests")

The Court was extraordinarily sensitive in *Miller* "to the complex interplay of forces that enter a legislature's redistricting calculus." *Miller*, — U.S. at ——, 115 S.Ct. at 2488. It recognized that legislatures engaged in this difficult process "will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process." *Id.* (citations omitted). The Court also understood the delicate line-drawing that factfinders would have to engage in:

> "The distinction between being aware of racial considerations and being motivated by them may be difficult to make. This evidentiary difficulty, together with the sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments, requires courts to exercise extraordinary caution in adjudicating claims that a state has drawn district lines on the basis of race. The plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision ..."

*Id.*

It would be impossible, without an actual plan, without "circumstantial evidence of a district's shape and demographics," without a showing that "the legislature subordinated traditional race-neutral districting principles

... to racial considerations," for a court to make the informed and sophisticated judgment called for by the Supreme Court in *Miller*. If and when the School Board does adopt a plan with one or more majority-black districts, the court may then determine whether that plan violates *Miller*.

Second, the Court made clear in *Miller* by its repeated citations to and discussion of *Arlington Heights*, that it was not altering the legal standard by which we assess violations of Section 5. *See, e.g., Miller,* — U.S. at ——, 115 S.Ct. at 2487 (quoting *Arlington Heights* for proposition that in purpose inquiry, courts must look at impact and "other evidence of race-based decisionmaking"). *See also id.* — U.S. at ——, 115 S.Ct. at 2483. Plaintiffs must still prove the absence of discriminatory purpose, applying the standards set forth in *Arlington Heights* and related cases in the voting rights area, such as *Mobile v. Bolden*, 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980) and *Rogers v. Lodge*, 458 U.S. 613, 102 S.Ct. 3272. As the evidence shows, the School Board has made no such showing. The School Board would, through its reading of *Miller*, essentially undercut the vitality of *Arlington Heights* in a Section 5 case. That was not the intent of the Supreme Court.

Third, assuming *arguendo*, the existence of some hypothetical plan which contains one or more majority-black districts (we do not know which since we do not have a plan before us), the record makes clear that it is possible to draw at least one such district in Bossier Parish, consistent with *Miller* and *Shaw v. Reno*, — U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). By affirming the race-conscious California redistricting plan in *DeWitt v. Wilson*, 856 F.Supp. 1409 (E.D.Cal. 1994) (decided the same day as *Miller*), *aff'd* — U.S. ——, 115 S.Ct. 2637, 132 L.Ed.2d 876 (1995), the Supreme Court made clear that considering race in redistricting, by itself, does not automatically trigger strict scrutiny. In *DeWitt*, the district court found that the California plan "evidences a judicious and proper balancing of the many factors appropriate to redistricting, one of which was the consideration of the application of the Voting Rights Act's objective of assuring

that minority voters are not denied the chance to effectively influence the political process." 856 F.Supp. at 1413–14.

As noted earlier, *Miller* recognizes that "traditional race-neutral districting principles [such as] compactness, contiguity, and 'respect for political subdivisions' . . . can defeat a claim that a district has been gerrymandered on racial lines." *Miller,* —— U.S. at ——, 115 S.Ct. at 2488 (citations omitted). As discussed in detail above, *see* Section II(D), *supra,* the alternative plans presented to the School Board and this court do rely upon "traditional districting principles." The districts in the illustrative plans are contiguous, reasonably compact, and respect communities with actual shared interests. *See* Testimony of Price; Testimony of Hawkins; Stip ¶¶ 181–95. Moreover, at least one of the alternative plans would unite a predominantly black residential area, which is split under the Board's plan. "[W]hen members of a racial group live together in one community, a reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes." *Shaw v. Reno,* —— U.S. at ——, 113 S.Ct. at 2826 (1993). Thus, assuming these districts existed—and they do not—the School Board could not meet its burden under *Miller* to show that race rather than traditional districting principles was the predominant force.

For all of these reasons, the School Board's reliance on *Miller v. Johnson* is unpersuasive.

### V.

The evidence in this case demonstrates overwhelmingly that the School Board's decision to adopt the Police Jury redistricting plan was motivated by discriminatory purpose. The adoption of the Police Jury plan bears heavily on the black community because it denies its members a reasonable opportunity to elect a candidate of their choice. The history of discrimination by the Bossier School System and the Parish itself demonstrates the Board's continued refusal to address the concerns of the black community in Bossier Parish. The sequence of events leading up to the adoption of the plan illustrate the Board's discriminatory purpose. The School Board's substantive departures from traditional districting principles is similarly probative of discriminatory motive. Three School Board members have acknowledged that the Board is hostile to black representation. Moreover, some of the purported rationales for the School Board's decision are flat-out untrue, and others are so glaringly inconsistent with the facts of the case that they are obviously pretexts.

\* ˉ \* \*

Sometimes we need to step back and look at first principles. Congress passed the Voting Rights Act to combat the "unremitting and ingenious defiance of the Constitution" by several states, *South Carolina v. Katzenbach,* 383 U.S. 301, 309, 86 S.Ct. 803, 808, Louisiana among them. The Bossier School Board continues to resist the Constitution, through its ingenious, if subtle, discrimination against the black citizens of Bossier parish. We are long past the point where discrimination can be easily proven by use of racial epithets, racial categories or openly exclusionary voting requirements. "The Voting Rights Act was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race." *Allen v. State Board of Elections,* 393 U.S. 544, 565, 89 S.Ct. 817, 831, 22 L.Ed.2d 1 (1968). In this case, the School Board's decision to adopt the Police Jury plan was a thinly-veiled effort to deny black voters a meaningful opportunity for representation on the School Board.

The burden is on the School Board to show lack of discriminatory purpose. Because the School Board's proffered reasons are pretextual, it has not met its burden under section 5 of the Voting Rights Act, and its request for pre-clearance must be denied.

Nov. 2, 1995

Date