**BOSSIER PARISH SCHOOL BOARD, Plaintiff,**

v.

**Janet RENO, Attorney General, Defendant,**

**George Price, et al., Intervenor–Defendants.**

**Civil Action No. 94–1495 (LHS (USCA), GK, JR).**

United States District Court, District of Columbia.

May 1, 1998.

James J. Thornton, Frank M. Ferrell, Shreveport, LA, for Plaintiff.

Gaye L. Hume, Robert A. Kengle, Jon M. Greenbaum, U.S. Dept. of Justice, Civil Rights Div., Washington, DC, for Defendant.

Patricia A. Brannan, Hogan & Hartson, L.L.P., Washington, DC, Edward Still, Brenda Wright, Lawyers' Committee for Civil Rights, Washington, DC, for Intervenor–Defendants.

Before SILBERMAN, Circuit Judge, and KESSLER and ROBERTSON, District Judges.

ROBERTSON, District Judge.

This case is before us on remand from the United States Supreme Court for further proceedings consistent with the Court's decision of May 12, 1997, 520 U.S. 471, 117 S.Ct. 1491. The parties have agreed that the record should not be reopened for the taking of additional evidence,[1] but they have submitted additional briefs. After reviewing the record in compliance with the Supreme Court's opinion, we adhere to our decision of November 18, 1995 granting preclearance under § 5 of the Voting Rights Act of 1965, 42 U.S.C. § 1973c, to the Bossier Parish School Board's redistricting plan ("the Jury plan"). The facts bearing upon our conclusion are all set forth in the opinions issued with our original judgment, 907 F.Supp. 434 (D.D.C.1995). The reasons for our decision to adhere to that judgment are set forth below.

In compliance with the Supreme Court's instructions, we have considered the relevance of certain " § 2 evidence" in evaluating the school board's intent for § 5 purposes. We have considered whether the plan in question "has a dilutive impact ... [making] it 'more probable' that the jurisdiction adopting that plan acted with an intent to retrogress than 'it would be without the evidence.'" 117 S.Ct. at 1501. We have applied the multi-part test articulated in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), to evaluate the school board's purpose. And, we have "address[ed] appellants' additional arguments that [we] erred in refusing to consider evidence that the board was in violation of an ongoing injunction to remedy any remaining

1. Plaintiff nevertheless argued in a reply memorandum that we should take judicial notice of the results of the 1990 school board election that took place subsequent to our original judgment. Why the school board would at first decline our invitation to reopen the record and then ask us to take judicial notice of the election results is a mystery, but in any case we decline to take judicial notice of the election results. Were we to consider the election results at all, we would need more information about them.

vestiges of [a] dual [school] system." 117 S.Ct. at 1503 (internal quotations omitted).

## I.

Before carrying out the tasks assigned to us on remand, and particularly before applying the *Arlington Heights* test to the record before us, it is necessary to decide what question we are answering. The Supreme Court was clearly interested in our view as to whether considering all of the evidence, the school board has carried its burden of proving that it did not intend to retrogress. The Court "le[ft] open for another day the question whether the § 5 purpose inquiry ever extends beyond the search for retrogressive intent." Justice O'Connor's opinion for the Court suggested that we might consider that question on remand.[2] Justices Breyer and Ginsburg were clearly uncomfortable with leaving the question for another day, "for otherwise the District Court will find it difficult to consider the evidence that we say it must consider," 117 S.Ct. at 1504.

We are not certain whether or not we have been invited to answer the question the Court left for another day, but we decline to do so in this case, because the record will not support a conclusion that extends beyond the presence or absence of retrogressive intent. We can imagine a set of facts that would establish a "non-retrogressive, but nevertheless discriminatory, purpose," but those imagined facts are not present here. The question we will answer, accordingly, is whether the record disproves Bossier Parish's retrogressive intent in adopting the Jury plan.

■ We must next decide what we mean by "retrogression." The controlling law is clear—up to a point. "Retrogression, by definition, requires a comparison of a jurisdiction's new voting plan with its existing plan ... [citation omitted]. It also necessarily implies that the jurisdiction's existing plan is the benchmark...." 117 S.Ct. at 1497. Intervenor argues that to search for retrogression in a jurisdiction that has never elected a

black person to its school board is a fool's errand, because "it would appear impossible to retrogress from zero." Brief on remand of defendant-intervenors, at 35. But the test of retrogressive intent, in our view, need not depend on the number of black persons elected. The language of *Beer v. United States,* 425 U.S. 130, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976), is just as applicable to the "purpose" inquiry as to the "effect" inquiry. Thus, a plan has an impermissible purpose under § 5 if it is intended to "lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer,* 425 U.S. at 141, 96 S.Ct. at 1364. That test is broad enough to identify "retrogression" regardless of the outcome of an election, if (to imagine an example not present in this case) polling places were located so that they are less convenient to black voters than before the change, or if (for an example closer to the facts of this case) downward adjustments were made in the percentage of black voters in one or more districts.

## II.

■ In applying the standard set forth above to the record of this case we adhere to our earlier attempt to fashion a method of analysis, set forth in our earlier opinion, 907 F.Supp. at 445–446, that acknowledges the difficulty of the school board's burden to prove the *absence* of discriminatory intent. Thus, we begin again with the observation that the school board's resort to the pre-cleared Jury plan (which it mistakenly thought would easily be pre-cleared) and its focus on the fact that the Jury plan would not require precinct splitting, while the NAACP plan would, were "legitimate, nondiscriminatory motives" entitling the school board to a finding that it had presented a *prima facie* case for preclearance.

The first *Arlington Heights* factor is "the impact of the official action—whether it 'bears more heavily on one race than another.'" 429 U.S. at 266, 97 S.Ct. at 564. In

---

**2.** "[W]e do not, contrary to Justice STEVENS' view ... necessarily assume that the Board enacted the Jury plan with some non-retrogressive, but nevertheless discriminatory, 'purpose.' The existence of such a purpose, and its relevance to § 5, are issues to be decided on remand." 117 S.Ct. at 1491.

this case, the question is whether the Jury plan bears more heavily on blacks than the pre-existing plan. The intervenor, referring to stipulations of record, argues that

> the board knew that the black population was growing in the northern portion of the county, where District 4 of the 1980's plan already had a black voting age population of 42.1 percent ... Faced with that information ... the board chose a plan that extended District 4 to the southeast and decreased the black voting age population to 40.9 percent. ... The board offered no race-neutral explanation for these changes. Therefore the board failed to carry its burden of proving that such changes were not intended to have their forseeable effect: 'to worsen the position of minority voters.'

Brief on Remand of Defendant–Intervenors, at 36–37. That percentage shift in dilution, even though it applies to only one of the twelve districts in question, might indeed be enough to rebut the non-discriminatory reasons advanced by the school board, were it not for the fact that the parties have stipulated the point away, agreeing that this reduction, and the reduction of the black population in another district from 36.9 percent to 36.1 percent, are *de minimis.* Stip. ¶ 252.

■ The intervenor points to a number of other allegedly dilutive impacts of the Jury plan in support of its discriminatory intent argument: that some of the new districts have no schools, that the plan ignores attendance boundaries, that it does not respect communities of interest, that there is one outlandishly large district, that several of them are not compact, that there is a lack of contiguity, and that the population deviations resulting from the jury plan are greater than the limits (± 5 %) imposed by Louisiana law. Two of those points—failure to respect communities of interest and cutting across attendance boundaries—might support a finding of retrogressive intent, if there were any corroborating evidence that the school board had deliberately attempted to break up voting blocks before they could be established or otherwise to divide and conquer the black vote. In the absence of such evidence in this

record, however, the point is too theoretical, and too attenuated, to be probative.

■ The second *Arlington Heights* factor is the historical background of the school board's adoption of the jury plan. That background is summarized at 907 F.Supp. at 455–56 and provides powerful support for the proposition that the Bossier Parish School Board in fact resisted adopting a redistricting plan that would have created majority black districts. Part of that history is the school board's resistance to court-ordered desegration, and particularly its failure to comply with the order of the United States District Court in *Lemon v. Bossier Parish School Board,* 240 F.Supp. 709 (W.D.La. 1965), *aff'd* 370 F.2d 847 (5th Cir.1967), *cert. denied,* 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1967), that it maintain a bi-racial committee to "recommend to the School Board ways to attain and maintain a unitary system and to improve education in the parish." Stip. ¶ 111. All of that history is admissible to prove intent. The intent it proves in this case, we think, is a tenacious determination to maintain the status quo. It is not enough to rebut the School Board's *prima facie* showing that it did not intend retrogression.

■ The remaining *Arlington Heights* factors do not require extended discussion. The specific sequence of events leading up to the school board's decision to adopt the jury plan is discussed in our previous decision at 907 F.Supp. at 448. It does tend to demonstrate the school board's resistance to the NAACP plan; it does not demonstrate retrogressive intent. Evidence in the record tending to establish that the board departed from its normal practices, *see* 907 F.Supp. at 457, establishes rather clearly that the board did not welcome improvement in the position of racial minorities with respect to their effective exercise of the electoral franchise, but is not evidence of retrogressive intent. As for the contemporary statements of participants in the board's decision and other details of legislative history, the several statements made by school board members were discussed at 907 F.Supp. at 447–448 and 907 F.Supp. at 459. They do not establish retrogressive intent.

SILBERMAN, Circuit Judge, concurring.

The Supreme Court remanded part of this case primarily because it was uncertain whether we had considered the "dilutive impact" of the Board's redistricting plan as relevant evidence in determining whether it had been adopted for a discriminatory purpose within the meaning of § 5. The term "dilution" has become a rather confusing word of art in § 2 cases, 42 U.S.C. § 1973. *See Abrams v. Johnson,* 521 U.S. 74, —— — ——, 117 S.Ct. 1925, 1935–38, 138 L.Ed.2d 285 (1997); *see also Thornburg v. Gingles,* 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). The Supreme Court never explicitly defined what it meant by evidence of "dilutive impact"—a phrase that neither the Court, any court of appeals, nor this district court has used in connection with § 2 before—in this case. A careful reading of the opinion suggests, however, that the Court meant only that the plan the Board adopted had less majority black districts than that which could have been created. *See Reno v. Bossier Parish Sch. Bd.,* 520 U.S. 471, 117 S.Ct. 1491, 1503, 137 L.Ed.2d 730 (1997). We, of course, never rejected such evidence; it was the premise of the government's case. "Here defendant argues that the School Board has failed to provide an adequate reason explaining why it declined to act on a proposal featuring two majority-black districts." *Bossier Parish Sch. Bd. v. Reno,* 907 F.Supp. 434, 449 (D.D.C.1995).

To be sure, we did say we would "not permit § 2 evidence to prove discriminatory purpose. . . ." *Id.* at 445 (emphasis added). But we never said that any evidence that would be relevant in a § 2 case would be excluded in a § 5 case. Indeed, in footnote 6 we specifically excluded "evidence relevant *only* to [a] § 2 inquiry," *id.* at 445 n. 6, necessarily implying that some evidence could go to both. The Supreme Court itself recognized that only "some of this '§ 2 evidence' may be relevant" in a § 5 case, *Reno,* 117 S.Ct. at 1501, and, furthermore, "[t]hat

evidence of a plan's dilutive impact may be relevant to the § 5 purpose inquiry does not, of course, mean that such evidence is dispositive of [proves] that inquiry." *Id.* at 1502.

The phrase "dilutive impact" was not used in our opinion—nor for that matter in the dissent—because it was not an issue in the case. That the NAACP offered an alternate plan whereby more majority black districts would be created was undisputed. (In that regard, I believe the government's filings in the Supreme Court were deceptive.) [1] The real issue in the case was whether Bossier Parish had an affirmative obligation to create the maximum number of black majority districts. I take it the Supreme Court agrees with us that it did not. "At one point, the District Court correctly stated that 'the adoption of one nonretrogressive plan rather than another nonretrogressive plan that contains more majority-black districts cannot by *itself* give rise to the inference of discriminatory intent.'" *Id.* at 1503, *quoting Bossier Parish,* 907 F.Supp. at 450.

As for the *Arlington Heights* framework which the Supreme Court said should be applied to determine whether the Board had a discriminatory purpose, it should be readily apparent that our previous opinion, without citing the case, did just that. We carefully considered "the historical background of the [jurisdiction's] decision"; "[t]he specific sequence of events leading up to the challenged decision"; "[d]epartures from the normal procedural sequence"; and "[t]he legislative or administrative history, especially . . . [any] contemporary statements by members of the decisionmaking body." *Id.* at 1503, *quoting Arlington Heights v. Metropolitan Housing Corp.,* 429 U.S. 252, 267–68, 97 S.Ct. 555, 50 L.Ed.2d 450 (1976). The Court does not indicate that our review of that evidence was in any way inadequate except that it notes that we did not indicate how we viewed the claim that Bossier Parish was in supposed violation of an injunction issued by the west-

1. In its brief on remand, the government, only in passing, refers to the plan's "dilutive impact." Plaintiff asks us to take judicial notice that two blacks have been elected to the School Board since we granted preclearance of the plan.

While I doubt that we may take notice of this, it seems anomalous to emphasize, as Judge Kessler does, that no black has ever been elected to the Board. *See* Dissent at 36–37.

ern district of Louisiana to unify the school system. We do so now.

KESSLER, District Court Judge, dissenting.

This case is before us on remand from the United States Supreme Court for further proceedings consistent with its May 12, 1997 decision in *Reno v. Bossier Parish Sch. Bd., et al.,* 520 U.S. 471, 117 S.Ct. 1491, 137 L.Ed.2d 730. Upon further review and consideration of the record in accordance with the Supreme Court's mandate, I am forced once again to conclude that I cannot in good conscience agree with the result reached by my colleagues. Instead, I remain convinced that "the School Board's decision to adopt the Police Jury redistricting plan was motivated by discriminatory purpose", *Bossier Parish Sch. Bd. v. Reno, et al.,* 907 F.Supp. 434, 463 (D.D.C.1995) (Kessler, J., dissenting), and should thus be denied preclearance under the Voting Rights Act of 1965, 42 U.S.C. § 1973c ("Voting Rights Act").

### I.

In its opinion, the Supreme Court confirmed that "a violation of § 2 [of the Voting Rights Act] is not grounds in and of itself for denying preclearance under § 5 [of the Act]." 117 S.Ct. at 1500. The Court stated that nevertheless, such "[§ 2] evidence of a plan's dilutive impact may be relevant to our § 5 purpose inquiry". 117 S.Ct. at 1502. The Court emphasized that § 2 evidence, while potentially relevant to the § 5 purpose inquiry, is not dispositive of that inquiry. Consequently, the Court directed us to consider and weigh the relevance of "evidence of the dilutive impact of the Board's redistricting plan". *Id.* at 1503.

The Supreme Court also directed us, in conducting our inquiry into the School Board's motivation, to apply the framework articulated in *Arlington Heights v. Metro. Hous. Dev. Corp., et al.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). The *Ar-*

*lington Heights* framework has been used both to evaluate "whether invidious discriminatory purpose was a motivating factor" in a government body's decisionmaking and also, "at least in part, to evaluate purpose in [the Court's] previous § 5 cases." 117 S.Ct. at 1502 (citing *City of Pleasant Grove v. United States,* 479 U.S. 462, 469–70, 107 S.Ct. 794, 93 L.Ed.2d 866 (1987)).

My colleagues have limited their § 5 purpose inquiry to a search for intent to retrogress and have declined to consider whether the § 5 inquiry ever extends beyond that search for retrogressive intent. I read the Supreme Court's mandate more broadly. The Supreme Court stated that, while it did not assume "that the Board enacted the Jury plan with some nonretrogressive, but nevertheless discriminatory, 'purpose'[, t]he existence of such a purpose, and its relevance to § 5, are issues to be decided on remand." 117 S.Ct. at 1501. Given the clarity of these words, I fail to see how we can avoid carrying out the Supreme Court's directive to (1) inquire into the existence of "some nonretrogressive, but nevertheless discriminatory, 'purpose' "; and (2) determine the relevance of such a purpose (should one exist) to our § 5 inquiry.

Finally, the Supreme Court directed us to address the government's arguments that the District Court "erred in refusing to consider evidence that the Board was in violation of an ongoing injunction" to attain a unitary system of education in the Parish.[1] 117 S.Ct. at 1503.

### II.

The majority finds that School Board has made out its prima facie case for preclearance. The School Board states that it adopted the Police Jury plan for at least two nondiscriminatory motives—the "plan offered the twin attractions of guaranteed preclearance and easy implementation". 907 F.Supp. at 447. To make out its prima facie case, "the School Board must demonstrate that the

---

1. The injunction was imposed on the School Board after it was found liable for intentionally segregating the public schools. *See Lemon v. Bossier Parish Sch. Bd.,* 240 F.Supp. 709 (W.D.La.1965), *aff'd* 370 F.2d 847 (5th Cir.1967), cert. denied 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350. *See also Lemon v. Bossier Parish Sch. Bd.,* 421 F.2d 121 (5th Cir.1969); *Lemon v. Bossier Parish Sch. Bd.,* 444 F.2d 1400 (5th Cir. 1971).

proposed change will have no retrogressive effect, and that the change was undertaken without a discriminatory purpose. Proof of nondiscriminatory purpose must include 'legitimate reasons' for settling on the given change." *Id.* at 446 (citing *Richmond v. United States,* 422 U.S. 358, 375, 95 S.Ct. 2296, 45 L.Ed.2d 245 (1975) ).

I find that the reasons given by the School Board for adopting the Police Jury plan are not at all "legitimate". The majority, in its earlier opinion, conceded that the School Board did not favor the Police Jury plan until "the redistricting process began to cause agitation within the black community", 907 F.Supp. at 447, since the plan "wreaked havoc with the incumbencies of four of the [twelve] School Board members and was not drawn with school locations in mind." *Id.*

The conclusions I reached in my original dissent are as valid now as they were then:

The Policy Jury plan only became "expedient" when the School Board was publicly confronted with alternative plans demonstrating that majority-black districts could be drawn, and demonstrating that political pressure from the black community was mounting to achieve such a result. The common-sense understanding of these events leads to one conclusion: The Board adopted the Police Jury plan—two years before the next election—in direct response to the presentation of a plan that created majority-black districts. Faced with growing frustration of the black community at being excluded from the electoral process, the only way for the School Board to ensure that no majority-black districts would be created was to quickly adopt the Police Jury plan and put the issue to rest. This sequence of events of "public silence and private decisions," culminating in the Board's hasty decision, is evidence of the Board's discriminatory purpose.

907 F.Supp. at 457–58 (Kessler, J., concurring in part and dissenting in part) (footnote omitted).

The School Board has thus failed to establish a prima facie case that is "supported by 'credible and credited evidence'". 907 F.Supp. at 446 (citation omitted). Its prof-fered reasons for acceptance of the Police Jury plan are clearly pretextual. This conclusion alone permits us to deny preclearance to the School Board's plan.

A more thorough evaluation of the School Board's intent, under the purpose prong of § 5, only reinforces the necessity of this conclusion and outcome.

### III.

The parties agree that the School Board's proposed redistricting plan will not have a retrogressive effect. Resolution of this case thus turns on whether the School Board can demonstrate by a preponderance of the evidence that it did not adopt the plan with an unlawful purpose. The Supreme Court left it to us to decide whether our "purpose" inquiry is limited to a search for retrogressive intent, or whether our inquiry should extend beyond that search.

The Voting Rights Act was enacted by Congress "to 'attac[k]· the blight of voting discrimination' across the Nation." 117 S.Ct. at 1496–97 (quoting S.Rep. No. 97–417, 2d Sess., p. 4 (1982) U.S.Code Cong. & Admin.News 1982 pp. 177, 180; *South Carolina v. Katzenbach,* 383 U.S. 301, 308, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966)). Before implementing a change in "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting", a jurisdiction must first obtain either administrative preclearance from the Attorney General or judicial preclearance from the District Court for the District of Columbia. 42 U.S.C. § 1973c. Section 5 of the Act imposes on a jurisdiction the burden of proving that its proposed change "does not have the purpose and will not have the effect· of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973c. It is well-settled that a plan has an impermissible effect under § 5 only if it "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." 117 S.Ct. at 1497 (quoting *Beer v. United States,* 425 U.S. 130, 141, 96 S.Ct. 1357, 47 L.Ed.2d 629 (1976)). We must decide whether a plan has an impermissible purpose under § 5 *only* if the

jurisdiction intends the plan to "lead to a retrogression", or if an impermissible purpose also includes a "nonretrogressive, but nevertheless discriminatory purpose".

The Supreme Court stated that "Congress enacted § 5, not to maintain the discriminatory status quo, but to stay ahead of efforts by the most resistant jurisdictions to undermine the Act's purpose of 'rid[ding] the country of racial discrimination.'" 117 S.Ct. at 1509 (Stevens, Souter, JJ., dissenting in part and concurring in part). If we were to deny preclearance under § 5 only to those new plans enacted specifically with a retrogressive purpose, however, we would commit ourselves to granting § 5 preclearance to a "resistant" jurisdiction's nonretrogressive plan even if the record demonstrated an intent by that jurisdiction to perpetuate an historically discriminatory status quo by diluting minority voting strength.

Since "a new plan enacted with the purpose of unconstitutionally diluting minority votes is an unconstitutional plan," 117 S.Ct. at 1505 (Breyer, Ginsburg, JJ., concurring in part and concurring in the judgment) (citations omitted), a construction of § 5 that limits its purpose inquiry to a search for retrogressive intent could require us to preclear nonretrogressive but *nevertheless unconstitutional* voting plans. Such a result is clearly inconsistent with the purpose of both the Voting Rights Act in general and § 5 in particular. Along with Justices Breyer and Ginsburg, I do not "believe that Congress would have wanted a § 5 Court (or the Attorney General) to approve an unconstitutional plan adopted with an unconstitutional purpose." *Id.* at 1506.

I thus join Justices Breyer, Ginsburg, Stevens, and Souter in concluding that "the 'purpose' inquiry does extend beyond the search for retrogressive intent." *Id.* at 1505.

### IV.

The Supreme Court stated that § 2 "evidence of the dilutive impact of the Board's redistricting plan" may be relevant in a § 5 proceeding to establish a jurisdiction's "intent to retrogress". *Id.* at 1501. As stated above, however, I find that our § 5 purpose inquiry should extend beyond a search for the jurisdiction's intent to retrogress; I will thus assess the relevance of § 2 evidence to establish not only whether the School Board acted with an intent to retrogress, but also whether it acted with the unconstitutional purpose of diluting minority voting strength. Thus, pursuant to the Court's mandate, I believe we must first consider evidence that would be relevant to the § 2 inquiry on dilutive impact, and second, determine the relevance of that evidence to our § 5 purpose inquiry.

Plaintiffs claiming vote dilution under § 2 must first establish that the racial group "is sufficiently large and geographically compact to constitute a majority in a single-member district". *Id.* at 1498 (citations omitted). In this case, the School Board received, in addition to the plan presented on September 3, 1992, two other plans demonstrating that "it is possible to draw majority-black districts in Bossier Parish which are fully consistent with traditional districting principles." *Bossier Parish Sch. Bd. v. Reno, et al.,* 907 F.Supp. 434, 454 n. 3 (D.D.C.1995) (Kessler, J., concurring in part and dissenting in part). Furthermore, the School Board has admitted that it is "obvious that a reasonably compact black-majority district could be drawn in Bossier City." *Id.* (quoting Stip. ¶ 36.)

Second, § 2 plaintiffs must establish that the group is "politically cohesive". In order "to ascertain whether minority members constitute a politically cohesive unit and to determine whether whites vote sufficiently as a bloc usually to defeat the minority's preferred candidates", the Supreme Court has directed courts to inquire into the existence of racially polarized voting. *Thornburg v. Gingles,* 478 U.S. 30, 56, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986). Here, the Stipulations clearly demonstrate that voting in Bossier Parish is racially polarized. 907 F.Supp. at 454 (citing Stip. ¶¶ 181–96). Such racial polarization indicates that blacks in Bossier Parish are a "politically cohesive" group.

Third, § 2 plaintiffs must establish that the white majority usually votes as a bloc to defeat the minority's preferred candidate. 117 S.Ct. at 1498 (citations omitted). Parties stipulate, in the record before us, that no

black person has been elected to the Bossier Parish School Board despite the fact that 20.1% of the population is black.[2] (Stip.¶¶ 153, 5.) Stipulations ¶¶ 181–95 discuss racially polarized voting patterns in Bossier Parish. Analysis of several elections illustrated that, in at least two elections, "the black candidates were the choice of the black voters in these elections, but were not the choice of the white voters." (Stip. ¶ 186; *see also* Stip. ¶¶ 181–95.)

Fourth, plaintiffs claiming § 2 vote dilution "must also demonstrate that the totality of the circumstances supports a finding that the voting scheme is dilutive." 117 S.Ct. at 1498 (citing *Johnson v. DeGrandy,* 512 U.S. 997, 1011, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994); *Gingles,* 478 U.S. at 50–51, 106 S.Ct. 2752). *Gingles* spells out the typical factors which may be relevant to a totality analysis of a § 2 claim. 478 U.S. at 44–45, 106 S.Ct. 2752. They include:

(1) "[T]he history of voting-related discrimination in the State or political subdivision". *Id.* at 44, 106 S.Ct. 2752. Parties' Stipulations ¶¶ 213–47 discuss the extensive history of official and voting-related discrimination in Bossier Parish.

(2) "[T]he extent to which voting in the elections of the State or political subdivision is racially polarized". *Id.* at 44–45, 106 S.Ct. 2752. As already noted, the Stipulations clearly demonstrate that voting in Bossier Parish is racially polarized. 907 F.Supp. at 454 (citing Stip. ¶¶ 181–96).

(3) "[T]he extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group". *Gingles,* 478 U.S. at 45, 106 S.Ct. 2752. See, *e.g.,* Stip. ¶¶ 228–29, which discuss the implementation by the State of Louisiana in 1968 and 1971 of voting procedures, including the adoption of at-large elections and multi-member districts, which the

Attorney General found diluted black voting strength.

(4) "[T]he exclusion of members of the minority group from candidate slating processes". *Gingles,* 478 U.S. at 45, 106 S.Ct. 2752. We have no evidence indicating that black individuals have been excluded from candidate slating processes.

(5) "[T]he extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process". *Id.* at 45, 106 S.Ct. 2752. The parties have stipulated that:

Education, income, housing and employment are considered standard measures of socioeconomic status. These factors repeatedly have been found to translate into political efficacy ... Black citizens of Bossier Parish suffer a markedly lower socioeconomic status than their white counterparts. This lower socioeconomic status is traceable to a legacy of racial discrimination affecting Bossier Parish's black citizens.

(Stip.¶¶ 198–99.)

(6) "[T]he use of overt or subtle racial appeals in political campaigns". *Gingles,* 478 U.S. at 45, 106 S.Ct. 2752. We have no evidence demonstrating that racial appeals have been used in political campaigns.

(7) "[T]he extent to which members of the minority group have been elected to public office in the jurisdiction." *Id.* The record before us shows that no black candidate has been elected to the Bossier Parish School Board. (Stip.¶ 153.)

The *Gingles* Court noted that "there is no requirement that any particular number of factors be proved, or that a majority of them point one way or the other." *Id.* (quoting S.Rep. at 29, U.S.Code Cong. & Admin.News 1982, p. 207).

---

**2.** In his concurrence, Judge Silberman refers to the Plaintiff's request that we take judicial notice that two black individuals were elected to the School Board since the closing of the record before the first District Court opinion. It would be inappropriate in this case to take judicial notice of this fact. First, the Supreme Court explicitly denied the School Board's request to supplement the record in *Reno v. Bossier Parish School Board, et al.,* 517 U.S. 1154, 116 S.Ct. 1540, 134 L.Ed.2d 645 (1996). Second, the parties specifically agreed in this remand that the record should not be reopened.

Finally, § 2 plaintiffs "must also postulate a reasonable alternative voting practice to serve as the benchmark "undiluted" voting practice." 117 S.Ct. at 1498 (citing *Holder v. Hall,* 512 U.S. 874, 881, 114 S.Ct. 2581, 129 L.Ed.2d 687 (1994) (plurality opinion)). The School Board has been given several plans showing that it is possible to draw majority-black districts in Bossier Parish in a manner consistent with traditional districting principles. 907 F.Supp. at 454.

Having considered "evidence of the dilutive impact of the Board's redistricting plan", 117 S.Ct. at 1503, I conclude that it overwhelmingly demonstrates the following: the black voting population in Bossier Parish is sufficiently large and geographically compact to constitute a majority in at least two single-member districts; black voters are politically cohesive; the white majority votes sufficiently often as a bloc to enable it repeatedly to defeat the blacks' preferred candidates; and finally, the totality of the circumstances supports a finding that the School Board's plan is dilutive.[3]

It would be impossible to ignore the weight and the relevance of this § 2 evidence to the School Board's intent to dilute the voting strength of blacks in Bossier Parish.

## V.

The Supreme Court has also directed us to apply the framework, articulated in *Arlington Heights v. Metro. Hous. Dev. Corp., et al.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), to evaluate the School Board's purpose in adopting the Police Jury plan. 117 S.Ct. at 1503.

In Part II of my initial dissent, I discussed in detail the *Arlington Heights* framework and applied it to this record. *See* 907 F.Supp. at 453–60 (Kessler, J., concurring in part and dissenting in part). Based on that analysis, I believed then, and for the same reasons still believe now, that:

[T]he only conclusion that can be drawn from the evidence is that the Bossier

School Board acted with discriminatory purpose. The adopted plan has a substantial negative impact on the black citizens of Bossier Parish. The sequence of events leading up to the decision show conclusively how the School Board excluded the black community from the redistricting process and rushed to adopt the Police Jury plan only when faced with an alternative plan that provided for black representation. The plan itself ignores and overrides a number of the School Board's normally paramount interests. And the statements of some School Board members certainly lend strength to the other evidence ... We cannot blind ourselves to the reality of the situation and the record before us.

*Id.* at 460 (Kessler, J., concurring in part and dissenting in part).

The majority has, consistent with the Supreme Court's mandate, also applied the *Arlington Heights* analysis to the record. It examines each of the *Arlington Heights* factors, however, only for the purpose of finding evidence of retrogressive intent. This is far too limited and narrow an inquiry. Since our § 5 purpose inquiry should, in my opinion, extend beyond a search for retrogressive intent, so too should our *Arlington Heights* analysis.

In its analysis of the impact of the Jury plan[4] (the "important starting point" for assessing discriminatory intent under *Arlington Heights*), the majority states that the plan's failure to respect communities of interest and the fact that it cuts across attendance boundaries "might support a finding of retrogressive intent, *if there were any corroborating evidence that the school board had deliberately attempted* to break up voting blocks before they could be established or otherwise to divide and conquer the black vote." Majority Op. at 32 (emphasis added). I find nothing in *Arlington Heights* nor in the Supreme Court's opinion in *Bossier* that supports the imposition of the additional requirement of "corroborating evidence" of a

---

3. This conclusion is, of course, only reinforced by the School Board's concession that the "plan did dilute black voting strength." (Pl.'s Br. at 21.)

4. Plaintiff concedes that "[t]he impact of the School Board plan does fall more heavily on blacks than on whites". (Pl.'s Br. at 12.)

jurisdiction's "deliberate[ ] attempt[ ] to ... divide and conquer the black vote" before evidence of dilutive or disparate impact can be considered relevant to an *Arlington Heights* examination of purpose.

In considering the historical background of the School Board's decision, the majority found that the School Board has resisted court-ordered desegregation and failed to comply with the Court's order in *Lemon v. Bossier Parish Sch. Bd.*, 240 F.Supp. at 709. The majority admits the existence of "powerful support for the proposition that the Bossier Parish School Board in fact resisted adopting a redistricting plan that would have created majority black districts", and concluded that "[a]ll of that history ... proves in this case, we think, [ ] a tenacious determination to maintain the status quo." What the majority overlooks or ignores is that the status quo which the School Board is so anxious to maintain is a discriminatory one. Furthermore, the record demonstrates that the School Board hopes to maintain that discriminatory status quo by unconstitutionally diluting black voting strength. Thus, the majority's conclusion (that the School Board acted with an intent to maintain the discriminatory status quo) leads to denial of preclearance to the Jury plan under the purpose prong of § 5.

The majority also finds that "[e]vidence in the record tending to establish that the board departed from its normal practices establishes rather clearly that the board did not welcome improvement in the position of racial minorities with respect to their effective exercise of the electoral franchise, but is not evidence of retrogressive intent". Majority Op. at 32 (citations omitted). Such an "improvement in the position of racial minorities", however, is precisely what is necessary to redress the current discriminatory status quo in Bossier Parish. Limiting their inquiry to a search for retrogressive intent only permits my colleagues to all but concede that the School Board acted with a nonretrogressive but nevertheless discriminatory intent. They nevertheless grant preclearance under § 5 to the School Board's plan, even though "the purpose part of § 5 prohibits a plan adopted with the purpose of unconstitutionally diluting minority voting strength, whether or not the plan is retrogressive in its effect." 117 S.Ct. at 1506 (Breyer, Ginsburg, JJ., concurring in part and concurring in the judgment).

## VI.

Finally, the Supreme Court directed us to "address [the Government's] additional arguments that [the District Court] erred in refusing to consider evidence that the Board was in violation of an ongoing injunction 'to remedy any remaining vestiges of [a] dual [school] system'". 117 S.Ct. at 1503.

My initial dissent considered this evidence and found it relevant since *Arlington Heights* states that "the historical background of the challenged decision" is properly part of the purpose inquiry. 429 U.S. at 267, 97 S.Ct. 555. Since 1965, the Bossier Parish School Board has been the defendant in *Lemon v. Bossier Parish School Board*, Civ.Act. No. 10,687 (W.D.La., filed Dec. 2, 1964). My dissent noted that, "[t]o this day, the School Board remains under direct federal court order to remedy any remaining vestiges of segregation in its schools", and discussed the Board's dismantling of a Biracial Committee "in direct violation of a federal court order". *Id.* at 456. Ultimately, I found that "this history reveals an insidious pattern which cannot be ignored, and must inform our decision today ... [T]he Bossier Parish School Board's actions effectively eliminate the black community from the political process." *Id.*

I thus again conclude that the School Board's decision to adopt the Police Jury redistricting plan was motivated by a discriminatory, if not necessarily retrogressive, purpose. The evidence overwhelmingly indicates that the Bossier Parish School Board is one of those "most resistant jurisdictions" whose efforts Congress sought to combat when it enacted § 5 of the Voting Rights Act.

## *ORDER*

For the reasons set forth in the opinion issued today by this three-judge court, it is this 1st day of May, 1998,

**40**

**ORDERED** that plaintiff Bossier Parish School Board is given pre-clearance for its election plan adopted on October 1, 1992, and that it shall have a declaratory judgment to that effect.